## VALDEZ v. UNITED STATES.

### ERROR TO THE SUPREME COURT OF THE PHILIPPINE ISLANDS.

No. 361. Argued April 23, 24, 1917.—Decided June 11, 1917.

The testimony of an accomplice who turns State's evidence in a murder case is not to be discarded because of his base character, or his oscillating retraction and reiteration of the charge, but must be accorded such weight as is due it when judged by confirming or opposing circumstances, by his character and the influences which invested him.

In this case the court, considering evidence on which was based a conviction of murder, concurred in by the court of first instance and the Supreme Court of the Philippine Islands, holds that the doubts aroused by the character and vacillation of the government's chief witness (who testified that he was hired by the defendant and did the killing under his direction), are not such as to justify a reversal in view of the corroborating evidence, including evidence of a motive on the part of the defendant, and the absence of any doubt that murder was actually done.

A view of the scene of the murder by the trial judge does not deprive the accused of his constitutional right, carried to him by the Philippine Code, to "meet the witnesses face to face," where the view is conducted in the presence and with the consent of his counsel, and no testimony is taken, and no improper remarks are addressed to the judge.

The right of the accused to be present during the inspection may be waived by his counsel; but, even when the right is not waived, his absence will not warrant a reversal if no prejudice resulted.

30 Phil. Rep. 293, affirmed.

THE case is stated in the opinion.

*Mr. Timothy T. Ansberry*, with whom *Mr. Challen B. Ellis* was on the briefs, for plaintiff in error:

The argument of Mr. Ansberry for the defendant was devoted to the facts and to the proposition that the absence of the accused during the view taken by the judge of first instance was fatal error. The accused, he said, was in jail at the time and had not consented. Section 5 of the Philippine Civil Government Act secures in all criminal prosecutions the right of the accused to be heard by himself and his counsel. Section 3270 of the Philippine Laws, Comp. Stats. 1907, declares: "In all criminal prosecutions the defendant shall be entitled to appear and defend in person and by counsel at every stage of the proceeding." It is unnecessary to argue at length the interpretation of these provisions, or the question of the rights of an accused in a felony case and the circumstances under which they may and may not be waived, for these questions are now settled by the recent decision in *Diaz* v. *United States*, 223 U. S. 442.

There this court laid down the rule of interpretation of Philippine Laws to be that the prevailing course of decision in the United States should be accepted as determining the nature and measure of the rights provided, and held that, by the prevailing course of decision in the United States, an accused who is on trial charged with a capital offense is incapable of waiving the right to be present.

There is only one subject remaining, and that is whether the rule is different when the proceeding was a view of the premises, and not the taking of testimony in the court room, instructions to the jury, etc. There is some authority for the proposition that a view of the premises is not "a part of the trial" on the ground that it does not involve the obtaining of evidence. Decisions to this effect

are mainly those dealing with the question as to whether a review on appeal is prevented by lack of a complete record when it appears that the jury viewed the premises; and the solution of the difficulty in some of the cases is that review may be had because a view of the premises is not a part of the trial. Some authorities have carried this suggestion into criminal cases where the question arose as to the necessity for the presence of the accused at a view of the premises. But without attempting to analyze these authorities, or the cases the other way, it is sufficient to say that both sound reason and the weight of authority support the proposition that a view of the premises in a criminal case is a part of the trial. 3 Wharton Criminal Law, 7th ed., § 3160; 22 Encyc. Pl. & Pr. 1059; *Tully* v. *Railroad Co.*, 134 Massachusetts, 499; *Wall* v. *United States Mining Co.*, 232 Fed. Rep. 613; *People* v. *Milner*, 122 California, 171; *Benton* v. *State*, 30 Arkansas, 328.

The whole theory upon which the accused is given a right to be present at the trial applies with equal force to his presence at a view of the premises. The right to be present, "scarcely less important to the accused than the right of trial itself" (*Diaz* v. *United States, supra*), was clearly not intended to be limited to any particular occasion, or any particular kind of proceeding in the trial, but extends to "any steps taken" (*Hopt* v. *Utah*, 110 U. S. 574) "from the empanelling of the jury to the reception of the verdict," and during this time "nothing shall be done in the absence of the prisoner" (*Lewis* v. *United States*, 146 U. S. 371, 372).

And what is true of a criminal trial before a jury is equally true of a criminal trial had, as in the Philippines, before a judge only. *Diaz* v. *United States, supra.*

The right of the accused to be present is given him, undoubtedly, that he may have the opportunity to observe, and be observed, at every step taken so that he may make the best use of his own knowledge of the facts,

and use that knowledge either in his testimony or in his conferences with counsel. At any moment of the trial something may arise which needs supplementing by facts of which the accused knows, or something may appear, either by observation of the jury or in oral evidence, which can be easily explained by the knowledge which the accused has. To say that the accused must be present when testimony, already transcribed, is read, or when the court instructs the jury, but that he need not be present when the jury is making an examination of objects and places about which the testimony centers and confirming or testing the testimony by actual view, ignores the real reason for the right.

But whatever may be the contention as to the proper function of a view of the premises, there can be no doubt that in the case at bar there was the "taking of evidence" at the view of the premises. *People* v. *Hull*, 86 Michigan, 446; *People* v. *Green*, 53 California, 60; *State* v. *Bertin*, 24 La. Ann. 46.

If any doubt could remain as to the right of the accused to be present at the view, because of any technical definition of the word "trial," it is disposed of by the broad language of the Philippine Code, which refers specifically to "every stage of the proceedings." See *Hopt* v. *Utah*, *supra*.

*The Solicitor General* and *Mr. Assistant Attorney General Warren* for the United States, submitted:

The plaintiff in error bases his right to be personally present at the view taken by the single judge trying the case without a jury upon § 5 of the Philippine Organic Act and § 3270 of the Philippine Compiled Statutes, which embody the provisions of the Fifth and Sixth Amendments to the Constitution of the United States conferring three distinct and separable rights: (a) The right of confrontation with the witnesses against him; (b) the right to be heard

by himself and counsel; (c) the right to be present at every stage of the trial.

The alleged right of a defendant to be present at a view cannot be derived from the right of confrontation with witnesses given by the Sixth Amendment. Such right applies only to testimonial evidence. *Mattox* v. *United States*, 156 U. S. 237, 242; *Dowdell* v. *United States*, 221 U. S. 325, 330; *Kirby* v. *United States*, 174 U. S. 47, 54, 55. See also *Mattox* v. *United States*, 146 U. S. 140; *Holt* v. *United States*, 218 U. S. 245, 252, 253; *Reynolds* v. *United States*, 98 U. S. 145.

The plaintiff in error claims that the right to be present at every stage of the trial is derived from the constitutional right to have the assistance of counsel for his defense. The right to have the assistance of counsel originated at a later period than the right to be present at every stage of the trial. As to the abuses which led to the adoption of this clause of the Sixth Amendment, see 2 Story on Constitution, §§ 1793, 1794. And see also 4 Black. Comm. 355; Foster's Crown Cases, 231, 232; 1 Bishop's New Criminal Procedure, §§ 14–22, 120.

The right of a defendant in a criminal case to be present at all stages of the trial, on the other hand, is a right which had long been secured to him at common law before the right to have counsel was granted to him and, therefore, is clearly not derived from the Sixth Amendment to the Constitution. Its derivation from the early English common law is well stated in *Ball* v. *United States*, 140 U. S. 118, 131. For further authorities from the common law, see Statute of 28 Edward III, c. 3, 1354; 4 Black. Comm. 318; and the following cases: *Rex* v. *Bacon* (1664), 1 Keble, 809; 1 Levinz, 146; *Rex* v. *Vipont* (1761), 2 Burr, 1163; *Rex* v. *Aiken* (1765), 3 Burr, 1785; *Rex* v. *Crowther* (1786), 1 T. R. 125, 127; *Rex* v. *Baker* (1745), 2 Strange, 1239; *Rex* v. *Nicolls* (1745), 2 Strange, 1227; *Rex* v. *Legingham* (1670), 2 Keble, 687; T. Taym. 193; *Rex* v. *Harris*

*and Duke* (1689), 1 Ld. Raym. 267, 482; Skinner, 683; Comberbach, 447; Holt, 399.; 1 Salkeld, 400; 12 Mod. 156; Lofft, 400; *Regina* v. *Templeman* (1700), 1 Salk. 56; *Rex* v. *Hayes* (1730), 2 Strange, 843; *Rex* v. *Gibson* (1734), 2 Strange, 968; Sessions Cas. 123; 2 Barnardiston, 412; Cunningham, 29; *Commonwealth* v. *Cody* (1896), 165 Massachusetts, 133; *Frey* v. *Calhoun* (1895), 107 Michigan, 130.

The right to be present at every stage of the trial must be derived from the "due process" clause contained in the Fifth Amendment to the Constitution. The dicta in *Diaz* v. *United States*, 223 U. S. 442, 452, which assumed that this right is derived from the Sixth Amendment, cannot be supported by authority.

Assuming, therefore, that the right to be present at all stages of the trial is a necessary part of the "due process" guaranteed by the Fifth Amendment, two questions arise in this case: (1) Is a view actually, in law, a "part of the trial" at which the common law required the defendant to be present? (2) Was the right to be present at a view such an "essential" right as public policy forbids to be waived, under the doctrine of *Hopt* v. *Utah*, 110 U. S. 574, as explained in *Lewis* v. *United States*, 146 U. S. 370, 372, and *Trono* v. *United States*, 199 U. S. 521, 533?

The weight of authority and of reason is to the effect that a view is not such a "part of the trial" as requires the defendant's presence. *People* v. *Thorn*, 156 N. Y. 286; *Price* v. *United States*, 14 App. D. C. 391, 405; 3 Wigmore on Evidence, § 1803; Supp., vol. 5, § 1803. See *State* v. *Ah Lee*, 8 Oregon, 214.

That the right to be present at a view is not such an "essential" right as public policy forbids to be waived is to be seen from the fact that, at the early common law, it was optional with the defendant whether he would give his consent to be present at a view or not; and no view could be taken without the defendant's consent in a

criminal case, and such consent could be given by the defendant with or without conditions. It is clear that, at common law, if he consented to a view in his absence, a view could be had in his absence. *Sir Edward Duncomb's Case* (1635), Croke's Charles, 366; *King* v. *Staughton* (1671), 2 Keble, 665; 1 Sid. 464; 2 Saunders, 160; *King* v. *Kingsmill* (1714), 1 Sess. Cas. 87; *Anonymous* (1728), 1 Barnardiston, 144; *King* v. *Hatchley Tradgeley* (1732), 1 Sess. Cas. 180 (repeated as *Anonymous*, 2 Barnardiston, 214); *King* v. *Redman* (1756), Ld. Kenyon, 384; 5 Bacon's Abridgment, 375; Thompson's Trials, § 879; *Commonwealth* v. *Chance* (1899), 174 Massachusetts, 245; *Commonwealth* v. *Knapp* (1830), 26 Massachusetts, 496; *Commonwealth* v. *Webster* (1850), 59 Massachusetts, 295.

It would be contrary to public policy to hold that defendant's presence at a view is legally necessary and non-waivable. In the first place, at no properly regulated inspection can a jury (or as in this case, a single justice) do more than observe the lay of the land and the disposition of the objects of interest connected with the crime. No evidence can be taken and no criticism or opinion offered by either side. There is, therefore, in spite of remarks in the cases, no valid reason necessitating the presence of the defendant. That is obviously the reason why defendants have so often waived the privilege of attendance. In the second place, in many parts of the United States, especially in Alaska and the Philippines, views may be taken of places hundreds or even thousands of miles away from the place of trial. In our Southern and Western States, also, views may be taken in distant places and sparsely settled regions. Facilities for travel may be limited; means of conveyance insecure. A requirement of the presence of the defendant, non-waivable by him, presents a real danger or added facility for the escape, or rescue, of the prisoner.

A conclusion, therefore, which would extend to a crim-

inal defendant a comparatively valueless privilege at the expense of the safe and effective execution of justice should be avoided if possible.

MR. JUSTICE McKENNA delivered the opinion of the court.

Valdez was proceeded against by complaint under the procedure of the Philippine Islands for the crime of murder. It was circumstantially described as having been committed by Valdez and one Francisco Amante and one Juan Gatmaitan, the latter having been induced by Valdez "by reason of a promise of reward" (900 pesos) to shoot one Eusebio Yuson with a shotgun furnished by Amante, inflicting nine mortal wounds, instantly killing Yuson.

There was a demurrer filed to the complaint which need not be noticed. Upon the trial of Valdez and Amante, after pleas of not guilty, the court in an opinion circumstantially reviewed the evidence and found Amante not guilty "for insufficiency of evidence." Valdez was found guilty "beyond reasonable doubt." He was sentenced to the penalty of death and to indemnification of the family of the deceased.

At a separate trial Gatmaitan was also found guilty and sentenced to imprisonment for life.

There was a motion for rehearing which was denied.

Valdez and Gatmaitan took separate appeals to the Supreme Court of the Islands, but, according to the statement of the court, at the request of counsel, the appeals were "heard and considered together, in order to give counsel for the defense an opportunity to develop any inconsistencies or contradictions which might appear as a result of a critical analysis and comparison of the evidence of record in both cases."

The judgment against Valdez was affirmed; that against Gatmaitan was modified by the substitution of death for

life imprisonment. Two of the judges dissented, one thinking that the "accused," not designating him (presumably Valdez), was entitled "to an acquittal under the facts presented"; the other being of opinion that the prosecution had "not proved the guilt of the appellants of the crime of which they were convicted."

The case is here upon a writ of error sued out by Valdez and the questions presented are, to quote counsel: (1) Whether the absence of the accused during a part of the proceedings in the trial constitutes an error requiring reversal, and (2) whether there was any evidence adequate to warrant the conviction.

The second question may be disposed of first. A negative answer is urged upon a consideration of the credibility of the witnesses, the relative probative strength of their testimonies, their mental and moral defects, the various statements of Gatmaitan, being a witness for the prosecution, first testifying to the guilt of Valdez and by subsequent statement retracting the accusation, and later retracting the retraction, and an asserted absence of motive for the crime.

The elements of these contentions were passed upon by the lower courts and the guilt of Valdez and Gatmaitan determined. It ordinarily would be enough to say that there was justification for the determination; but lest it may be supposed that the guilt of Valdez depended alone upon the testimony of Gatmaitan, he having been an active accomplice in the homicide, some comment becomes necessary and at least a characterization of the evidence.

Gatmaitan's testimony was, of course, an important factor, but it had substantial corroboration. He was shown, it is true, to be a low type of man. One who becomes for hire as he did the criminal executor of another's malice is usually such. No other would accept the shameful service. But it is not reserved for this case to make a

novel contribution to the criminal experience of the coun-
try or to demonstrate that there are such hirers and hire-
lings, and when the hireling turns state's evidence, as he
sometimes does, or his weakness, awed by the penalties
of his crime, breaks down and confesses, as it sometimes
does, or he changes or qualifies or retracts, as he some-
times does, as hope or interest or fear sways him, his tes-
timony or confession is not to be summarily discarded but
to be judged of by confirming or opposing circumstances
as well as by his character and the influences that may
invest him. And it was such judgment the two lower
courts exercised; it is such judgment in our turn that we
are required to exercise. This record, indeed, shows that
the character and characteristics of Gatmaitan, his mental
and social inferiority to Valdez, made him facile to Valdez'
solicitation and a purchasable agent for Valdez' purpose.
And Valdez was shown, independently of Gatmaitan's
testimony, to have had a purpose—a fixed enmity to ·
Yuson, engendered in a controversy over certain water
rights. In gratification of it he carefully planned the
crime, set its time and place, procured its weapon, gave
the weapon to Gatmaitan, and hired a scout to observe
the movements of Yuson and report his approach. The
service was exactly performed, and upon his approach
occurred the tragedy.

Yuson was shot in the back and instantly killed as he
was entering his home, and the crowning horror of it was
that it was done in the hearing and almost in the presence
of his wife, even as she was speaking to him and moving
to meet him.

Such is the outline of the crime. And crime it was.
There is no dispute about that or the manner of execution.
Valdez as a witness in his own behalf denied participation
in it or precedent knowledge and attempted to prove an
alibi. His denial was not believed, his alibi decided not
to have been established. It cannot be held, therefore,

that his conviction was not sustained by the evidence and the sentence imposed upon him not justified, even though its doom be death.

Upon the other question the record shows this: Gatmaitan was a witness for the prosecution. He related that he was employed by Valdez to kill Yuson for 900 pesos, given him, Gatmaitan, for that purpose, and that he shot Yuson as Yuson was approaching his (Yuson's) house— Valdez assisting him, Gatmaitan. Indeed, Gatmaitan testified that Valdez ordered him to shoot but that the gun would not go off, and Valdez showed him how to shoot—"and right at that moment the gun went off." Gatmaitan further testified that he and Valdez located themselves "in a fence near the staircase" of Yuson's house, and from that location fired the shot.

There was other testimony, as we have indicated, and distances of objects from one another were testified to.

At the close of the testimony the prosecuting attorney asked the court to visit "the place of the occurrence in order to make there an inspection so that the court may judge of the distances." One of the counsel for the defense assented, saying, "Yes; we do not object, so that the court may see." Another counsel for the defense called for the "motive" of the prosecution in asking "for the ocular inspection." It was replied that its object was to enable the court to obtain a correct idea "of all the distances in connection with the assassination of the deceased, as well also of the places where the witnesses for the prosecution found themselves and where they talked together." And further, "We want that done in order that everything may be clear." To which counsel for the defense replied that he had on occasions been present at ocular inspections and that testimony was taken which produced confusion, and, further: "What I wish, with the consent of the prosecuting attorney, is that an inspection be made there, but that no testimony be taken

because it produces great confusion when one tries to examine witnesses at the place of the occurrence."

The prosecuting attorney, however, thought it advisable not to dispense with such testimony or take from the court its discretion, "so that when the court arrives there it may ask of unknown persons where the deceased fell, where the wad was found, where Gatmaitan was, and where Mateo Arcilla was." All of which opposing counsel thought had been already proved.

The court expressed its willingness to make the inspection, as the result would be evidence for both parties after the defense had produced its rebuttal testimony, and upon the defense announcing that it had no rebuttal testimony, the case was closed.

The court made the inspection; Valdez was not present, but his counsel were. There is an opposition of affidavits submitted upon a motion for new trial. Those submitted by defendant (three of which were in almost exactly the same words) averred that the persons making them were present at the inspection by the court and saw the judge examine the various points at the scene of the crime and the point where Gatmaitan stood when he fired the murderous shot. That they also saw the widow of the deceased show the manner in which her husband fell—she illustrating—and that she also told the judge "certain facts which happened at the time of the murder." That they also saw Captain Crockett, of the constabulary, point out to the judge the places in the stairway and in the house where the shot had penetrated, and saw him walk with the judge and point out to him certain streets and houses connected with the case, and also saw the judge and such officer and the attorneys in the case and other persons examine other places.

One of the counsel for the defense also filed an affidavit. It averred that the judge went to the scene of the killing, accompanied by the attorneys for both sides, but that

neither Valdez nor his attorneys were consulted by the judge as to whether or not Valdez desired to accompany the court. That the widow of the deceased "explained to the judge many occurrences which she claimed had taken place on the night of the killing, . . . what she claimed to have said to the deceased just prior to the killing, and illustrated how and where the deceased had fallen, and discussed many other matters in connection with the case, during all of which time she was crying and wringing her hands in grief." That Captain Crockett was charged by at least one witness as being an official "of a body which had forced and intimidated" the witness to give false testimony against Valdez. That Captain Crockett pointed out bullet marks to the judge, pointed out where the shot was fired as indicated by Gatmaitan, and made other statements to the judge that Gatmaitan had made to him "as to other circumstances of the case." That Captain Crockett walked through the streets with the judge and pointed out to him various objects which had been referred to during the trial, part of the time being alone with the judge. That Captain Crockett discussed distances between objects, giving his opinion of the same, and particularly the distance from the house of the deceased to the house of Valdez, and told the judge in that connection that he had measured such distance with a "'speedometer' on his motorcycle." That during the inspection the affiant made objections as attorney for Valdez as to the conduct of the widow and Crockett but they were allowed to continue their conversations with the judge.

These affidavits were distinctly and circumstantially contradicted by affidavits accompanied by photographs of the positions of the judge and the persons involved. One of the affidavits was by Captain Crockett and two of them were by the attorneys who prosecuted the case, both of whom were present at the inspection and in such relation to it as to know what occurred.

The Supreme Court, in passing upon the motion, said: "A careful examination of these affidavits and the counter-affidavits filed by the appellee satisfies us that nothing more than inspection of the scene of the murder was made by the trial judge, and that no evidence whatever was taken on that occasion; and we are of opinion that under all the circumstances there was no violation of the constitutional right of the prisoner to be confronted with the witnesses. *People* v. *Thorn,* 156 N. Y. 286, 42 L. R. A. 368, and the cases cited in the extended note in the annotated report."

Such being the record, we must assume that the judge in his inspection of the scene of the homicide was not improperly addressed by any one and, in the presence of counsel, did no more than visualize the testimony of the witnesses—giving it a certain picturesqueness, it may be, but not adding to or changing it. It would be going a great way to say that the requirement of the Philippine Code, carrying the constitutional guaranty to an accused to "meet the witnesses face to face," was violated and could not be waived. And we think practically Valdez' presence was waived.

But, aside from any question of waiver, it would be pressing the right of an accused too far and *Diaz* v. *United States,* 223 U. S. 442, beyond its principle to so hold. As well might it be said that an accused is entitled to be with the judge in his meditations and that he could entertain no conception nor form any judgment without such personal presence.

The judgment should not be reversed upon a mere abstraction. It is difficult to divine how the inspection, even if the affidavits of the defendants should be taken at their face value, added to or took from the case as presented.

It follows that the judgment of the Supreme Court must be and it is                    *Affirmed.*

MR. JUSTICE CLARKE, dissenting.

I greatly regret that I cannot concur in the opinion of the court in this case and the fact that the decision must cost two men their lives impels me to state as briefly as I may my reasons for dissenting from it.

We have before us the record only in the case of Emilio Valdez.

Valdez is described in the opinion of the trial judge as "a highly educated man and very prominent both on account of his social standing and his wealth," and by the Supreme Court as "a recognized leader of an active political faction and a member of one of the richest, most powerful and influential families in the community."

He was convicted of lying concealed with another and of shooting, in the early evening, one Eusebio Yuson, also a man of prominence, as he was mounting an outside stairway to the second story of his village home. Pursuant to the practice of the Philippine Islands, the case was tried by a judge without the aid of a jury.

The guilt or innocence of Valdez turns upon the testimony of one Juan Gatmaitan, who was found by the trial court to be so "densely ignorant a man, of so low an order of intelligence and so lacking in instruction both mental and moral" that upon finding him guilty of participating in the murder, the court on this account, reduced his sentence from death to life imprisonment. The Supreme Court says of him that he "is a convicted cattle thief"; that "his testimony in his own behalf is wholly unworthy of credit" and that in his own case he repudiated all of his testimony in the Valdez case and testified in a manner "so incoherent, irrational and incredible as to cast doubt on all that he said in his own behalf."

To this we must add that this witness Gatmaitan first confessed to having murdered Yuson, without mentioning

Valdez. That afterwards, but two months before the trial of Valdez, he made affidavit that he and one Mateo Arcilla went to Valdez' house during the early evening of the day of the murder, that Valdez there gave them a shotgun in the village street, and that then the two, without Valdez, went and concealed themselves on the lot of Yuson and when he came home "I [Gatmaitan] discharged both barrels of the shotgun at him at the same time and then ran to Valdez' house and delivered the shotgun to him."

Next he gave testimony, such as we shall see, on the trial of Valdez and eight days later made oath in prison that the local constables had tortured him for three weeks, not allowing him to sleep day or night, and thereby had forced him to confess that he and Valdez had committed the murder, when the truth was he did not know who killed Yuson.

Nine days after this, again under oath, he denied all torture and persecution and says that his testimony on the trial of Valdez was true.

And finally the Supreme Court says that on his own trial he repudiated his testimony in the trial of Valdez, denied all knowledge of the crime and attempted to establish an alibi for himself.

Such is the witness who tells the following amazing story on which Valdez is sentenced to death:

I can neither read nor write. I never talked with Valdez but three times in my life. The first time I was looking for sugar cane seed and he said to me that "he wished to win my friendship,"—nothing else and we parted. The second time we met in Valdez' seed field and he offered me a business, which, according to his own statement, was an easy one. *I asked him what kind of a business it was and he said to me "that I should kill Eusebio Yuson and that he would pay me 900 pesos" ($450). I told him I could not please him because I was very busy with my work*

and no one could relieve me in said work. And he told me to say nothing about it to any one and thus we parted. The third time I met Valdez he came to my hut in my sugar cane fields about five o'clock of a Sunday evening (the evening of the murder) and he invited me to return to town and I rode with him in his calesa (carriage) to his home. During this drive of about an hour he said nothing to me. When we arrived at his house he left me in the street and went into the house. When the bell struck the time of evening prayer as he did not come down from the house I thought that he was praying and when he did come down from the house he said nothing to me but handed me a shotgun.

"Q. And what did you do when you received the gun?
A. He still invited me to go to Loasan.
Q. *What did he do?*
A. *He followed me.*
Q. Where did you go?
A. To the house of Lieutenant Eusebio Yuson."

He says that on the way to Yuson's house he and Valdez stopped at a store and one Figueroa came and told them that Yuson was already there and they then approached Yuson's house and located themselves in the fence near the staircase (outside the house leading to the second story) and when Yuson arrived Valdez ordered the witness to shoot.

"Q. And what did you do?
A. I tried to shoot but the gun would not go off.
Q. And then?
A. He approached me and said 'Son of a Whore, he was able to go up and you won't shoot' and he showed me how to shoot and right at that moment the gun went off."

On cross-examination he says he pulled the two triggers and that the gun would not go off and that then Valdez showed him how to shoot. "I was holding the shotgun this way [indicating] and he was showing me how to shoot,

saying, 'This way,' and without more ado the shot came out, the shot gun fell and I was frightened and ran away from the place and I know nothing more." He says he had never handled fire arms before, and did not know how to shoot a gun and that he did not tell Valdez that he did not know how to shoot. The shot thus fired was the one fatal to Yuson.

I shall not go into the testimony of the corroborating witnesses for the prosecution, Mateo Arcilla, who is described by the Supreme Court as "a convicted wife murderer, sentenced to life imprisonment for that crime since he appeared as a witness at the trial of Valdez," and Figueroa who with Gatmaitan and Arcilla the trial judge says pleaded guilty before a justice of the peace to murdering Yuson, without implicating Valdez.

The only motive suggested on the part of Valdez for murdering Yuson is a difference between him or his mother (it is not clear which) and Yuson about some boundary and water rights, which had been amicably settled four years before the murder, and an indefinite business rivalry, which is only remotely alluded to by the widow of the deceased.

A careful reading of this entire record convinces me, and the opinions of the lower courts throughout proceed upon the assumption, that the conviction of Valdez could not be thought of except this story of Gatmaitan which I have thus detailed from the record is believed to be true. Under the authority of the decisions of this court in *Wiborg* v. *United States*, 163 U. S. 632, 658; *Clyatt* v. *United States*, 197 U. S. 207, and in *Diaz* v. *United States*, 223 U. S. 454; I have thus examined this record for the purpose of determining whether there is any substantial evidence to be found in it to warrant the conviction of the defendant, and my conclusion is that there is no such evidence, because after making full allowance for differences of habit, of life and of character of the persons in-

volved and of the witnesses, I cannot conceive it possible that a man such as Valdez is described to be, even if he desired the death of an enemy or a rival (as to which there is no evidence) would bribe to shoot him an entire stranger of the most ignorant type obtainable, who had never used fire arms; should promise him money to commit the murder; should deliberately hand him, in the early evening, in a village street, the gun with which to shoot the victim; *and then should go with the murderer to the scene and participate in the assassination by pulling the trigger which fired the fatal shot.*

Comment would be superfluous. The mere narration of the story makes it impossible for me to consent to making it the legal basis for depriving a man of his life, for the testimony of Gatmaitan is not merely mistaken testimony due to faulty recollection or statement, but one of his series of stories is necessarily, consciously and corruptly false, and therefore the other should not be relied upon, especially not in a capital case. It is not uncommon for ignorant and corrupt men to falsely charge others with doing what they imagine that they themselves, in their narrow minds and experience, would have done under the circumstances of a given case, and the surest check, often the only check, on such perjury, is to recognize the impossibility that men of larger instruction and resources and experience could have been guilty of such conduct. It is, of course, possible that Valdez committed or inspired this crime but it is impossible to believe that he would have committed it in the crude, certain to be detected, manner described by Gatmaitan.

This conclusion is arrived at putting wholly aside the defense of the accused, in which he took the witness stand and, so far as the record shows, sustained himself through a searching cross-examination, in a categorical denial of the, to me, utterly incredible stories of the prosecuting witnesses.

But even if the evidence in the case were deemed by me credible I still should conclude that the judgment should be reversed for the purely legal reason which I shall now state.

When the state closed its evidence in rebuttal the prosecuting attorney requested the court (there was no jury) to view the scene of the murder. To this counsel for the accused assented but with the request that "no testimony be taken because it produced great confusion when trying to examine witnesses at the place of the occurrence." To this request the prosecuting attorney replied: "What Mr. Southworth says would be very advisable, but I believe it would be very advisable also not to dispense with the task in which the court may exercise its discretion, so that when said court arrives there *it may ask of unknown persons where the deceased fell, where the wad was found, where Gatmaitan was, and where Mateo Arcilla was.*"

Then this follows:

"The Court: The court has no objection to making that inspection after the defense has produced its rebuttal evidence, *not showing in the record the result of said inspection.*

Mr. Southworth: We have no rebuttal evidence.

The Court: So that we may close the case?

Mr. Chicote: Yes, sir.

The Court: Good, tomorrow you may present your arguments. The session of the court is closed."

The record further shows that the judge visited the scene of the murder, that Valdez was confined in prison several miles away at the time of the visit and that he was neither required nor invited to be present at the view.

The visit to the scene by the judge without the presence of the accused is assigned as one of the reasons why a new trial should be granted, on the ground that such action violated § 5 of the Act of Congress of July 1st, 1902,

known as the "Philippine Bill," and also Article VI of the Amendments to the Constitution of the United States, providing that the accused "shall enjoy the right to be confronted with the witnesses against him."

What was done by the judge at this view is the subject of much dispute and conflict of statement made in affidavits on motion for a new trial. A typical statement in the interest of the accused of what occurred is made by his attorney, who is described in the record as a reputable member of the bar, who stated that the widow of the deceased explained to the judge what she claimed had taken place on the night of the murder, pointing out where the deceased had fallen, and discussing many other matters in connection with the case, she weeping and wringing her hands all of the time that such interview was in progress, and that one Crockett, a constable, was active in indicating to the court various points and circumstances connected with the murder, all of this against objections made by counsel as to the conduct of the widow and Crockett.

A typical affidavit introduced by the State was by the private prosecutor Buencamino, who stated that he was present at the view, that the judge "neither received any evidence nor admitted any testimony referring to the case then being prosecuted against Valdez, and according to my best recollection I did not see the widow crying, but I saw her at a place distant from the judge. I also state that Captain Crockett did not give any evidence before the judge."

An assistant attorney for the Government made affidavit that at no time did he see the widow crying or talking to the judge, or illustrating how her husband had fallen.

However, a photograph of the scene at the time of the view indicates that it must have been a very unusual local event for a large crowd was present, and in this photograph the widow is shown in a position which must have been

very close to the judge and it is very significant that there is no statement from the judge as to just what he did and as to what occurred at the view.

It has long been familiar, textbook, law, that a viewing of the premises where the crime is alleged to have been committed is part of the trial. Thus, in Wharton's Criminal Pl. & Pr., 9th ed., § 707, it is said: "The visit [of the jury] must be made . . . in the presence of the accused, who is entitled to have all evidence received by the jury taken in his presence." And in Enc. of Pl. & Pr., vol. XXII, p. 1059, it is said: "In criminal cases the accused is entitled to be present if the jury is sent to view the *locus* of the crime, as a view in the absence of the accused would violate his constitutional right to appear in person and be confronted with the witnesses against him."

But the law upon this subject has been recently summed up by this court (*Diaz* v. *United States*, 223 U. S. 442, 454) in an admirable statement, which in my judgment rules the case before us, and is as follows:

"We are thus brought to the question whether the provision in § 5 of the Philippine Civil Government Act, securing to the accused in all criminal prosecutions 'the right to be heard by himself and counsel,' makes his presence indispensable at every stage of the trial, or invests him with a right which he is always free to assert but which he also may waive by his voluntary act. Of course if that provision makes his presence thus indispensable, it is of no moment that the Philippine laws do not go so far, for they cannot lessen its force or effect. *An identical or similar provision is found in the constitutions of the several States, and its substantial equivalent is embodied in the Sixth Amendment to the Constitution of the United States.* It is the right which these constitutional provisions secure to persons accused of crime in this country *that was carried to the Philippines by the congressional enactment, and, therefore, according to a familiar rule,*

*the prevailing course of decision here may and should be accepted as determinative of the nature and measure of the right there.* Kepner v. United States, 195 U. S. 100, 124.

". . . In cases of felony our courts, with substantial accord, have regarded it as extending to every stage of the trial, inclusive of the empaneling of the jury and the reception of the verdict, and as being *scarcely less important to the accused than the right of trial itself. And with like accord they have regarded an accused who is in custody and one who is charged with a capital offense as incapable of waiving the right;* the one, because his presence or absence is not within his own control, and the other because, in addition to being usually in custody, he is deemed to suffer the constraint naturally incident to an apprehension of the awful penalty that would follow conviction. . . .

"The reasoning upon which this rule of decision rests is clearly indicated in *Barton* v. *State, supra,* [67 Georgia, 653] where it is said by the Supreme Court of Georgia:

"'It is the right of the defendant in cases of felony . . . to be present at all stages of the trial—especially at the rendition of the verdict, and if he be in such custody and confinement . . . as not to be present unless sent for and relieved by the court, the reception of the verdict during such compulsory absence is so illegal as to necessitate the setting it aside. . . . The principle thus ruled is good sense and sound law; because he cannot exercise the right to be present at the rendition of the verdict when in jail, unless the officer of the court brings him into the court by its order.'"

It is difficult to imagine a case which would show the value of this rule more strongly than the case we are considering. If the description of what occurred as given by counsel for the defendant is even approximately true it is not improbable that even the most stoical judge might have been influenced by it, and the presence of the defendant might very well have had a counterbalancing

influence, and in addition to this he was entitled to the benefit of any suggestion which he might have been able to make through his counsel.

It is very clear to my mind that *Diaz* v. *United States, supra,* in principle rules this case and that the viewing of the scene of the murder by the judge without the presence of the accused requires that it be reversed and a new trial granted.

That the conclusion I have reached in this case is not idiosyncratic or the result of an undue regard for a man's life when it is adequately proved to have been forfeited under the law is, I think, sufficiently shown by the fact that two of the members of the Supreme Court of the Philippine Islands expressed their estimate of the case made against Valdez by this record in these terms:

Moreland, J., dissenting: "I dissent. I think that the least the accused is entitled to under the facts and the law is a new trial. I believe, however, that he is entitled to an acquittal upon the facts as presented." And

Grant T. Trent, J.: "I dissent on the ground that . . . the prosecution has not proved the guilt of the appellants of the crime of which they were convicted."

For the reasons thus stated, I am of opinion that this record does not show any credible testimony supporting the judgment, that upon the authorities cited it rests upon error of law gravely prejudicial to the accused and that it therefore should be reversed and a new trial granted.

I am authorized to say that the CHIEF JUSTICE concurs in this opinion.