## GORDON v. UNITED STATES.

### No. 10275.

Circuit Court of Appeals, Sixth Circuit.

Dec. 8, 1947.

Donald B. Frederick, of Detroit, Mich., and William J. Corrigan, of Cleveland, Ohio (James E. Haggerty and Donald B. Frederick, both of Detroit, Mich., and Charles I. Russo, of Cleveland, Ohio, on the brief), for appellant.

Thomas P. Thornton, of Detroit, Mich. (Joseph C. Murphy, of Detroit, Mich., on the brief), for appellee.

Before SIMONS, ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

The appellant was convicted under an indictment containing two counts, the first of which charged conspiracy to violate § 415 of the National Stolen Property Act, Title 18 U.S.C. § 413 et seq., 18 U.S.C.A. § 413 et seq. The second count charged violation of the same section by unlawfully transporting in interstate commerce stolen goods, wares and merchandise of the value of $5,000 or more.

The pertinent portions of the statutes involved read as follows:

Section 415.

"Whoever shall transport or cause to be transported in interstate or foreign commerce any goods, wares, or merchandise, securities, or money, of the value of $5,000 or more theretofore stolen, feloniously con-

verted, or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen, feloniously converted, or taken * * * shall be punished by a fine of not more than $10,000 or by imprisonment for not more than ten years, or both. * * *"

Section 418a.

"If two or more persons enter into an agreement, confederation, or conspiracy to violate any provision of sections 413-419 of this title, and do any overt act toward carrying out such unlawful agreement, confederation, or conspiracy, such person or persons shall be punished in like manner as hereinbefore provided by sections 413-419 of this title."

The conviction was based principally upon the testimony of Herman Frank Banning, a co-defendant under the indictment. The period charged in the conspiracy count was January 1, 1940, to May 1, 1941. Banning testified that he took part, with various others, in approximately 25 robberies of jewelry salesmen in different parts of the country, ranging from Texas to Michigan, from Iowa through Missouri, Illinois and Indiana to Ohio, between 1937 and May 1, 1941. The time and place in each instance was specified. Some of the robberies were previous to, and some of them occurred during the period charged in the indictment. Banning's usual companions in these robberies were Jimmy Robinson, alias Russell, and Howard Graves, but at times he was assisted by James Williams, Russell Husten and Tony Petrilli. In the specific felony charged in the substantive count he was assisted by Howard Graves, Abe Zussman, and Bernard Sidran, co-defendants with appellant herein. The action as to Bernard Gridley, also a co-defendant, was dismissed at the end of the trial.

Banning stated that the stolen jewelry was generally taken to Chicago to be sold to the appellant who negotiated a price and paid for it, and that appellant also gave material assistance to the general operations of the jewelry thieves. Among other circumstances indicating appellant's active participation in the scheme, Banning declared that appellant advanced expenses for these trips and aided the confederates in securing motor cars which were essential to operations covering so many states. Banning also testified that appellant interceded with a physician in Chicago in May, 1941, in order to arrange so that Banning would not be compelled to appear in Omaha on May 19, 1941, to answer to a jewelry robbery charge.

The method which Banning and his confederates followed in the robberies was to hunt for and get on the track of some jewelry salesman whom they would follow from place to place and from city to city. They would ascertain whether this salesman carried his samples or wares in a trunk or on his person. If on his person, they followed him until they were able to hold him up and take the jewelry. If a jewelry trunk was used, they watched the expressman who was conveying the trunk to or from the station and would either steal it at a time when the expressman was occupied, or hold him up at the point of a pistol and take the trunk. Sometimes they followed the automobiles of jewelry salesmen, blocked the road, forced them to stop, and robbed them. Certain of the robberies described by Banning have already been the subject of indictment and conviction in the federal courts, Banning, Williams, Petrilli and Robinson, alias Russell, having been found guilty of transporting stolen jewelry in violation of the National Stolen Property Act. Banning v. United States, 6 Cir., 130 F.2d 330, certiorari denied, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556; Petrilli v. United States, 8 Cir., 129 F.2d 101, certiorari denied 317 U.S. 657, 63 S.Ct. 55, 87 L.Ed. 528; Russell v. United States, 8 Cir., 119 F.2d 686.

The substantive crime charged in the indictment was the transportation from Detroit, Michigan, to Chicago, Illinois, on September 13, 1940, of jewelry stolen from Walter Ollendorff at the Book-Cadillac Hotel. Banning stated that he and his confederates secured from one of the bellboys a pass-key to Ollendorff's room and to the locked closet in the room. They entered in Ollendorff's absence and took his cases containing jewelry. After they had separated the articles of value they burned the cases in a vacant lot near

Detroit. The fire was seen, and when the fire department extinguished it they found a few small articles of jewelry which were identified by a representative of the Ollendorff Watch Company as bearing the exclusive Ollendorff pattern. The bulk of the jewelry was taken to Chicago and purchased by Gordon.

The trial court did not err in denying motions to quash the indictment. Full answers were given to the two sets of interrogatories presented in the motions for bills of particulars and the accused was fairly apprised of the charges against him. Glasser v. United States, 315 U.S. 60, 66, 62 S.Ct. 457, 86 L.Ed. 680.

Nor did the court err in submitting to the jury the substantive count of the indictment which charged the interstate transportation of jewelry stolen in Detroit on September 13, 1940. While Walter Ollendorff had died prior to the trial, it was clearly shown not only by the evidence of Banning, but by police and fire department records and the testimony of the representative of the Ollendorff Watch Company that watches and watch-cases worth over $5,000 were stolen from Walter Ollendorff in Detroit on the date charged. This jewelry was transported to and bought by the appellant in Chicago.

We question whether the letter written by Walter Ollendorff to his brother, an officer of the Ollendorff Watch Company, with reference to this robbery was properly introduced in evidence. It was admitted upon the ground that it was made in the regular course of business within the meaning of 28 U.S.C. § 695, 28 U.S.C.A. § 695.

The alleged report was a highly personal account, written in familiar terms. While it stated the approximate number of pieces lost, as reported by Walter Ollendorff to the insurance agent, it hardly bore the ear-marks of a business report. Appellant contends that under the doctrine of Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719, no report of a jewelry loss is admissible under 28 U.S.C. § 695, 28 U.S.C.A. § 695. Appellee urges that reports of thefts of jewelry stock are necessarily made in the systematic conduct of the jewelry business and that the letter was thus clearly admissible.

We see some factual distinction between the situation presented here and in Palmer v. Hoffman, supra. It is the business of a jewelry company to sell its goods, and reports of losses of its stock would appear to be not only a necessary, but an integral part of the business itself. The letter in question is not, however, typical of entries "made systematically or as a matter of routine," and we therefore conclude that within the rule in Palmer v. Hoffman, 318 U.S. page 113, 63 S.Ct. 477, the evidence was not competent. Its admission was in no way prejudicial, for it was merely cumulative of other competent and unimpeached testimony.

The presence in Detroit of Banning and of Walter Ollendorff, Ollendorff's loss, the fire, and the finding of the few articles of jewelry unconsumed, were fully established by the testimony of employees of the Book-Cadillac Hotel, by Banning's registration card at the Hotel Tuller, and by members and records of the police and fire departments of Detroit. Banning's presence on the following day at the Hotel Southmore in Chicago, where he stated that the appellant valued the jewelry stolen from Ollendorff, was also shown by registration card of the Hotel Southmore. In view of the corroborative testimony as to appellant's assistance in these operations, later discussed, substantial evidence existed requiring the submission to the jury of the question of appellant's guilt under the substantive count.

It is vigorously urged that the value of the watches and the watch cases is not shown; but the formal report of the robbery made by Ollendorff to the Detroit police estimated the loss as "several thousand dollars" value "unknown at that time." The formal claim made by the Ollendorff Watch Company to the insurer was introduced in evidence, as well as the draft received in payment of the claim. The amount claimed was $6,190.50, and the insurance paid was $4,600. This was based upon inventory. The jewelry was intended for the retail trade in which the mark-up is between 50% and 60%. A qualified expert testified that the value of the jewelry

to the ultimate consumer was approximately $15,000, and thus completed this phase of the proof. Cf. United States v. Garvey, 2 Cir., 150 F.2d 767. It was proper to receive in evidence testimony as to the retail value of these items. Husten v. United States, 8 Cir., 95 F.2d 168. Substantial evidence existed indicating that the jewelry transported was worth more than $5,000.

The trial court did not err in submitting the conspiracy count, to the jury. The principal contention upon this point is that the conviction rests upon the uncorroborated testimony of an accomplice. Cf. Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876, relied upon by appellant. The court charged the jury that the testimony of Banning was to be received with caution and should be scrutinized "much more than if he had not been an accomplice." No exception was taken to the charge of the court upon this, or upon any other phase of the case.

A reading of the record shows that Banning's testimony is corroborated on many material points, and that substantial evidence exists of a continuing conspiracy between appellant and the various jewelry robbers to commit felonies such as Banning outlined. As to the specific crimes committed, Banning's story is amply supported by the testimony of a number of jewelry salesmen who appeared in court and stated that they had been robbed of valuable jewelry at the times and in the places detailed at length by Banning in his evidence. The value of a number of these lots of jewelry was proved by the insurance companies which paid the loss. Five of the robberies, including the Ollendorff robbery, occurred during the period laid in the indictment. The testimony as to previous robberies was admissible to prove intent. Banning v. United States, supra; Orloff v. United States, 6 Cir., 153 F.2d 292; United States v. Turley, 2 Cir., 135 F.2d 867; Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas.1914C, 128.

Banning's story is sustained by independent evidence not only as to the robberies committed, but as to the leading part which appellant played in guiding and assisting the operations. Appellant was not, as was the defendant in Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350, a mere "fence." While he was the receiver to whom the stolen jewelry was invariably transported, usually at Chicago, the jury evidently found that appellant financed and assisted the enterprises, and this finding is supported by the record. It was shown that appellant advanced $400 for expenses when Banning first joined the group, and that on one occasion Banning and Graves each owed appellant $1,100 for funds which appellant had advanced for the trips.

Banning said that he bought a number of cars during these years from an automobile dealer named Irving Braud, to use in the robberies, and that appellant assisted in the purchases. He declared that on one occasion he bought a Ford car for about $400, and only had ten or twenty dollars available for a down payment. He says that he told Braud to get the balance of the money from appellant, and that this was done. Also he said that he loaned Braud $2,000, which he got from appellant.

Braud strongly substantiated this phase of Banning's testimony. He did business with a number of the confederates, including the appellant. Braud met the appellant in 1937 through Jimmy Robinson, one of the jewelry thieves, and stated that Howard Graves, another confederate, was in his place of business. He was also acquainted with Husten, a member of the gang, one of whose robberies was considered by the Eighth Circuit in Husten v. United States, supra.

But Braud's testimony was corroborative of more than a mere close relationship between appellant and the group. He testified that on one occasion he needed some money, and Banning told him to get it from appellant. The money, $2,000, was received by Braud, and no security was required. Braud testified categorically that he "did contact Meyer Gordon at his office," and that he "did get money from" appellant after Banning told him to go there. He also testified that he sold cars to Banning, Jimmy Robinson, Williams, and appellant.

As to the incident of May, 1941, in which Banning described appellant as having arranged so that he would not have to answer to an indictment in a Nebraska state court, the corroboration is very complete. Appellant called a physician named Joseph Gale, whom he had known for ten or twelve years, and asked him to see Banning. Gale referred the matter to a Dr. Finkel, who sent a telegram, as requested, to Banning's attorney in Omaha. In the course of this incident Banning was entered at the Edgewater Hospital in Chicago, but it was found that he had nothing wrong with him, and the medical director of the hospital ordered him dismissed after a few hours. Four physicians testified as to this incident completely corroborating Banning.

The jury was entitled to consider this testimony connecting appellant with the financing of these robberies and with the successful effort to get Banning relieved of his obligation to appear in Omaha to answer to a state charge, and to conclude, from these and other circumstances, that appellant was more than a fence. Appellant was evidently found by the jury to have furnished means to carry out the robberies, and thus he aided the robbers just as truly as if he had been a present participant in each crime. Backun v. United States, 4 Cir., 112 F.2d 635, 637. His activities were of the kind that arise from direct participation in a conspiracy to commit the crimes charged in the indictment. Such close and helpful association with Banning, Graves and Robinson, Williams and Husten, as the record reveals, has a tendency to establish the conspiracy and the means, preparation and disposition to commit the crimes charged. Banning v. United States, supra. The testimony revealed a relationship between the jewelry robbers and appellant, warranting a finding that appellant was a party to the continuing conspiracy. There is no evidence that appellant withdrew from the conspiracy. This being the case, his absence from the scene of the various crimes was unimportant. Pinkerton v. United States, 328 U.S. 640, 645, 646, 66 S.Ct. 1180, 90 L.Ed. 1489.

Nor was there reversible error in the admission of testimony. It is un-necessary to detail the various objections, all of which have been considered. Much of the testimony objected to was so closely a part of the history of the conspiracy and of the substantive act as to be part of an interwoven chain of relevant circumstances. It lay within the discretion of the trial court as to whether it should be admitted, and this discretion was not abused. United States v. Sebo, 7 Cir., 101 F.2d 889. The fact that some of the testimony indicated the complicity of the accused in other crimes did not make it inadmissible, since it tended to throw light upon facts and conduct in issue. Means v. United States, 62 App.D.C. 118, 65 F.2d 206.

The objection that under Fiswick v. United States, 329 U.S. 211, 219, 67 S.Ct. 224, Banning's testimony constituted a confession made after the conspiracy was at an end and hence was not admissible against appellant has no merit. The Fiswick decision adheres to the well-established rule with reference to extra-judicial confessions in the situation where the admissions or confessions of an accused made outside of court are sought to be introduced in evidence. It has no application here, for Banning's statement, while it constitutes a confession of his own guilt, is made in open court and in the presence of the appellant. It constitutes direct and competent evidence that appellant performed the acts charged in the indictment. Valdez v. United States, 244 U.S. 432, 37 S.Ct. 725, 61 L.Ed. 1242; Nibbelink v. United States, 6 Cir., 73 F.2d 677.

Finally, we consider whether the trial was unfair due to the circumstance that Sidran and Graves, two of the co-defendants, were not present. Sidran and Graves, during the period of these criminal proceedings, were confined in the Ohio State Penitentiary under a state sentence for jewelry robbery. As stated by Government counsel at the trial, and not denied, a writ of habeas corpus was applied for in order to secure their presence at the trial; but the warden of the Ohio State Penitentiary refused to produce them. Although notified in open court that the presence of Sidran and Graves at the trial had been refused, appellant's counsel made no request for adjournment. The trans-

fer of a prisoner from federal to state jurisdiction, or vice versa, for trial under an indictment, is exercised under the rules of comity. Cf. Ponzi v. Fessenden, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607, 22 A. L.R. 879. There is no express authority authorizing the transfer of a prisoner held under a judgment of conviction in a state court to a federal court for trial upon a federal charge. The Government took all available steps to insure the presence of Sidran and Graves at the trial; but since no authority could compel them to be present, the proceedings in this respect were not unfair.

The judgment of the District Court is affirmed.