UNITED STATES of America, Appellee,

v.

Abraham Arnold WILLIS, Appellant.

No. 13661.

United States Court of Appeals Third Circuit.

Argued Jan. 21, 1963.

Decided Aug. 26, 1963.

Gibson Smith, Jr., York, Pa., for appellant

Bernard J. Brown, U. S. Atty., Scranton, Pa., for appellee.

Before STALEY and SMITH, Circuit Judges, and SHAW, District Judge.

SHAW, District Judge.

This is an appeal from judgment of conviction on Indictment charging that appellant transported in interstate commerce merchandise, taken by fraud, of a value of $5,000 or more in violation of 18 U.S.C.A. § 2314.

The only question presented for consideration on appeal is whether there was competent evidence introduced at trial from which the jury could infer that the goods shipped in interstate commerce had a market [1] value of $5,000 or more.

The factual background which brought about the Indictment and subsequent conviction of appellant may be summarized briefly as follows: During October, 1956, appellant Willis, together with a partner, Nathan Karesky,[2] opened a store in Wilkes-Barre, Pennsylvania, known as "Sandy's Discount House," for the ostensible purpose of retail sale of electric appliances. Representations made as to the nature of the business they intended to conduct, the credit rating of Willis and character references given made it possible for them to obtain a line of credit with Cerullo's Electric Store, a wholesale house in Hazleton, Pennsylvania, dealing in electrical appliances. On the basis of the credit extended, Willis and Karesky obtained merchandise from Cerullo's of a wholesale value of $13,919 over a period of a few weeks. Checks tendered in payment which were returned because of insufficient funds and the dishonor of trade acceptances caused Cerullo's to discontinue credit during November of 1956. Of the sum total of $13,919 owing, only $1,150 was paid, consisting of $500 in cash to cover a check in that amount returned because of insufficient funds and $650 in money orders to induce continuance of the line of credit.

Shortly after discontinuance of the line of credit, it came to the attention of Cerullo's that the store opened by Willis and Karesky had been closed and padlocked and that custody of the merchandise found there was in the landlord. Inventory of this remaining merchandise

1. " * * * 'Value' means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to a single indictment shall constitute the value thereof." 18 U.S.C.A. § 2311. See Husten v. United States, 95 F.2d 168 (8th Cir. 1938);

Gordon v. United States, 164 F.2d 855 (6th Cir. 1947) ; Stern v. United States, 204 F.2d 647 (6th Cir. 1953) ; Herman v. United States, 289 F.2d 362 (5th Cir. 1961).

2. Jointly indicted and convicted with appellant for violation of 18 U.S.C.A. § 2314.

established a wholesale value of $5,991.-61.

There was evidence of sale and delivery by Sandy's Discount House of electrical appliances obtained from Cerullo's Electric Store to Sport Appliance Stores, located in Dorchester, Massachusetts, and to Arlmont Pharmacy, located in Belmont, Massachusetts.[3] The amount charged to Sport Appliance Stores for merchandise delivered, as shown on the invoices from Sandy's Discount House, was $1,898.84. There was testimony that there was a mark-down on the merchandise of ten to fifteen per cent below the wholesale level. The amount charged to Arlmont Pharmacy, as shown on invoices of Sandy's Discount House, for merchandise delivered there was $1,170.73. There was no testimony with respect to any mark-down of price from wholesale level on this merchandise, and it would appear from the invoices that it was charged to Arlmont Pharmacy on the basis of cost to Sandy's Discount House, which would be the wholesale price. Leonard Cerullo, president of Cerullo's Electric Store, testified that the mark-up from wholesale price for retail sales ranged from fourteen to thirty-six per cent.

Considering this evidence in the light most favorable to the Government, wholesale value of merchandise shipped to Sport Appliance Stores would be $2,233.-92 and, by applying a thirty-six per cent mark-up for retail price, the retail value would be $3,038.14. As shown by the invoices, the wholesale value of the merchandise shipped to Arlmont Pharmacy was $1,170.73, and, applying the same thirty-six per cent mark-up from wholesale, the maximum retail value of the merchandise would be $1,592.19. Based on these computations, which find support in the evidence,[4] the sum total of retail value of the merchandise shipped by Sandy's Discount House in Wilkes-Barre, Pennsylvania, to Sport Appliance Stores and Arlmont Pharmacy in Massachusetts would not exceed $4,630.33.

The only other proof upon which the Government relied to establish that the merchandise shipped in interstate commerce had a value of $5,000 or more is contained in Exhibits G–22 and G–26, introduced in evidence on the testimony of Special Agent Houlihan of the Federal Bureau of Investigation.

G–22, which was prepared by him prior to trial on the basis of investigation conducted, lists items of merchandise furnished to Sandy's Discount House by Cerullo's which were sold by Sandy's Discount House to Sport Appliance Stores and Arlmont Pharmacy. The Exhibit purports to show, under a column captioned "Total Retail Price," that the retail price value of the merchandise furnished to Sport Appliance Stores amounted to $5,329.84, and that the total retail price value of merchandise furnished to Arlmont Pharmacy amounted to $1,844. Parenthetically, it may be noted that the arithmetical computation of these totals, as they appear on this Exhibit, is not correct. Correct addition of the items of retail price of Sport Appliance Stores merchandise shows a total amount of $3,885.15 and of the Arlmont Pharmacy items, a total of $1,734.95. Accordingly, on correct computation of the items of retail price shown on this Exhibit, the total of retail value of the merchandise shipped to both stores would be $5,620.10.

Exhibit G–26 in evidence was prepared during the course of trial by Agent Houlihan, with the assistance of Agent Boylan, also of the Federal Bureau of Investigation, who did not testify. It lists the items of merchandise sold to

---

3. There was also evidence of delivery of a hi-fi set to Boston, Massachusetts, and of some other merchandise obtained from Cerullo's to a store in Binghamton, New York, but there was no evidence introduced from which a jury could determine the value of these items.

4. Invoices marked in evidence as Exhibits G–18a, b, and c, and G–23a and b, and testimony of Nathan Pilavin, owner of Sport Appliance Stores, also known as Sport Auto Store, and of Leonard Cerullo, president of Cerullo's Electric Store.

Sport Appliance Stores and Arlmont Pharmacy, as shown on the invoices of Sandy's Discount House, which were introduced in evidence. It also contains a column captioned "List" in which Agent Houlihan set forth list retail prices of the various items of merchandise which, added together, show total retail value of $5,315.58.

These Exhibits, G–22 and G–26, were admitted in evidence over objection of counsel for Willis. The ground of the objection was that they contained hearsay and that the opinion of value of the merchandise stated therein did not constitute competent proof.

Summaries of entries in books and records made and kept in the regular course of business are admissible in evidence to aid the jury when prepared by a person shown to be competent to summarize such information and the books and records from which the same was obtained are available to the adverse party for purposes of cross-examination of the witness through whom the summary is offered. The practice of admitting such summaries in evidence is confined generally to situations where the books and records constituting the primary proofs are voluminous and the product of technical skill in the professional fields of bookkeeping and accounting. See 8 Wigmore, Evidence, § 1230 (3rd ed.).

It has also been held uniformly that summaries supported by primary evidence in the record are likewise admissible. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1942); United States v. Augustine, 189 F.2d 587 (3rd Cir. 1951); Papadakis v. United States, 208 F.2d 945 (9th Cir. 1953); United States v. Bernard, 287 F.2d 715 (7th Cir. 1961). But where access to the primary sources from which a summary is prepared is not available to an adverse party for the purpose of cross-examination to test the accuracy of the summarized information, or where the summary, in the nature of secondary evidence, is not derived from other competent supporting proofs in the case, the admission thereof may, in particular circumstances, constitute prejudicial error. United States v. Ward, 169 F.2d 460 (3rd Cir. 1948); United States v. Michener, 152 F.2d 880 (3rd Cir. 1945). In the case of United States v. Ward, supra, it was stated:

" * * * [W]hile it can scarcely be gainsaid that voluminous records may be summarized, or that an expert may interpret and explain certain evidence in the case and on the basis of such evidence perform tasks beyond the training and experience of the layman juror, it is nevertheless axiomatic that the 'expert' may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility. Nor may expertness be the medium for injecting into the record material and information not a part of the expert's qualifications and otherwise inadmissible through his lips. Apropos is the statement we made in United States v. Michener, 3 Cir., 1945, 152 F.2d 880, 883: 'The admission into the evidence of the auditors' conclusions and opinions as distinguished from mere statements of fact summarizing what was observed by them in the records was erroneous. * * *' And it was in aggravation of the error for Johnson to base his determination of the value of the evidence in the case upon information which had been collected, and which could have been directly submitted to the jury for its appraisal."

Agent Houlihan admitted that he was not qualified as an expert to furnish an opinion as to the value of any of the items of merchandise in question and that such information as to value that he included in Exhibits G–22 and G–26 was obtained from Leonard Cerullo and other persons or sources at Cerullo's Electric Store.

Leonard Cerullo, in his testimony, merely identified the retail prices set forth in Exhibit G–22 as the prices obtained by Agent Houlihan from Cerullo's

**552**

at the time the Exhibit was prepared. A careful reading of his testimony clearly demonstrates that it could not be considered as an expression of qualified expert opinion verifying the retail price values contained in Exhibit G–22. There was no other testimony which would serve as competent proof of value to support the statement thereof by Agent Houlihan in Exhibit G–22.

Even assuming that Agent Houlihan was qualified by his accounting experience to summarize the pertinent records at Cerullo's, there was no evidence as to the particular records setting forth retail prices which he used, the identity of personnel (other than Leonard Cerullo) from whom he obtained further information in reaching his conclusion, or any evidence of the fact that such records as he did consult were records made and kept with respect to the retail price values in the regular course of Cerullo's wholesale business. In fact, it would appear that retail prices which might have been furnished to him by any personnel or from records at Cerullo's were nothing more than retail prices suggested by the manufacturer of the appliances.

The pertinent testimony with respect to the foregoing is quoted from the record as follows:

TESTIMONY OF FREDERICK T. HOULIHAN, SPECIAL AGENT OF F. B. I.:

"Q. Are you an accountant?

"A. No, I am not, but I have had accounting training.

"Q. Have you ever sold televisions?

"A. No. I have not.

"Q. Have you ever sold mix masters?

"A. No, I have not.

"Q. Have you ever sold electric razors?

"A. No, I have not.

"Q. You are not an expert on the value of any of these types of appliances, are you?

"A. No, I am not."

"Q. In other words, your opinion as to value is based upon what Mr. Cerullo told you?

"A. That is correct, and from their records.

"Q. You yourself have no opinion as to value?

"A. No."

———

"Q. Now, in preparing Government's Exhibit No. 22, you consulted with Mr. Leonard Cerullo, did you not——

"A. That is right.

"Q. (Continuing)—and with some of the employees of Cerullo's?

"A. That is right."

TESTIMONY OF LEONARD F. CERULLO:

"Q. Did you or your company at that time work out a list with Mr. Houlihan?

"A. Yes.

"Q. And what type of list did Mr. Houlihan and Cerullo's prepare?

"A. Well, I put it on to our merchandise manager and credit manager to give him a list of everything that was shipped to Sandy's, including the prices.

"Q. Now, what prices were recorded on your invoices—the wholesale or retail prices?

"A. Well, Sandy's as a dealer comes under the wholesale prices.

"Q. And did Cerullo's make available to Mr. Houlihan the retail prices for the corresponding items?

"A. Yes.

* * * * * *

"Q. Mr. Cerullo, I show you what has been marked as Government's Exhibit No. 22 and ask you what it purports to be?

"A. Well, this is the wholesale and retail prices of the traffic items.

"Q. Are these the items that Mr. Houlihan obtained the retail prices on from Cerullo's at that time?

"A. Yes.

\* \* \* \* \* \*

"By THE COURT: \* \* \*

"Do you suggest a retail price to your retailer?

"By THE WITNESS:

"They are suggested by the manufacturer. We do not suggest it.

"By THE COURT:

"And what is the percentage mark-up ordinarily on this range of products?

"By THE WITNESS:

"It averages between 14 and around 35 to 36%.

"By THE COURT:

"35 to 36%?

"By THE WITNESS:

"Yes. You get into fractions.

"By THE COURT:

"The manufacturer suggests a mark-up on the appliances and things of the kind involved here—of a retail price that would indicate a 14 to 35 to 36% mark-up above the wholesale price, or above cost from the manufacturer?

"By THE WITNESS:

"Above cost from us.

"By THE COURT:

"Above cost from the distributor?

"By THE WITNESS:

"Right."

Agent Houlihan was not qualified as an expert on retail price values of electrical appliances. The statement of retail price values set forth on Exhibits G–22 and G–26 were not grounded upon any competent evidence that had been adduced at trial. It was not shown that the suggested retail prices on the invoices of Cerullo's to Sandy's Discount House were anything more than prices suggested by the manufacturer. The evidence as to other sources of information which he took into consideration in arriving at his conclusions is clearly of hearsay character.

We conclude that the trial court erred in admitting Exhibits G–22 and G–26 in evidence for the purpose of establishing the value of the merchandise shipped in interstate commerce. Since the value stated in these Exhibits was the only proof from which the jury could infer that the merchandise in question had a value in the amount of $5,000 or more, we further conclude that the error committed was prejudicial and that the cause should be remanded for a new trial.

Accordingly, the judgment of the District Court will be reversed and the cause remanded to that Court for a new trial.