**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert GRAY, Defendant-Appellant.**

Nos. 74–2282, 74–2283.

United States Court of Appeals,
Fifth Circuit.

Feb. 7, 1975.

Rehearing Denied March 3, 1975.

Sydney B. Nelson, Shreveport, La., for defendant-appellant.

L. Edwin Greer, Asst. U. S. Atty., Donald E. Walter, U. S. Atty., Joseph S. Cage, Jr., Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before RIVES, WISDOM and COLE-MAN, Circuit Judges.

RIVES, Circuit Judge:

After a six-day trial by jury, Robert Gray was convicted of income tax evasion in violation of 26 U.S.C. § 7201 and of filing a false and fraudulent income tax return in violation of 26 U.S.C. § 7206(1). The calendar years 1967 and 1968 constitute the period covered. Two judgments of conviction were entered with sentences totaling six months' imprisonment to serve, five years on probation, and a requirement that, within twenty-four months, he pay taxes due with penalties and interest.

On appeal, Gray makes no claim of insufficiency of the evidence to support the jury's verdict, but contends that in the course of his trial the district court committed reversible errors. We find no reversible error and hence affirm.

### THE FACTS

Gray had some school training as an accountant. He had been employed as bookkeeper for a construction company, then for nine years as comptroller of an independent oil drilling company. In 1966 he had formed a self-owned corporation, Tennky Petroleum Company. He testified that, "I drilled twelve or fifteen wells myself" (App. 427). He also testified to "quite a bit" of activity in the stock market. In 1968 his purchases and sales had amounted to $206,747.72 (App. 485).

For the calendar year 1967 he reported the taxable income of himself and his wife as $9,499.19, a figure less than half of their true taxable income. For 1968 he reported taxable income of $14,125.16, when it was actually nearly four times that amount. The discrepancies were accounted for by items of income not reported and deductions reported to which he was not entitled. He admitted making profits in the stock market which he forgot to report (App. 580, 581). He admitted also that in 1968 he had received from Southwest Production Company a salary totaling $9,750.00 which he forgot to report (App. 507). That $9,750.00 was paid by thirteen checks for $750.00 each. At Gray's request Southwestern made those checks payable to his corporation, Tennky Petroleum Company. Gray testified that he picked up a check twice a month, deposited it to the Tennky account and then wrote a check to himself "presumably the same day" and deposited that check to his personal account. He reported as income from Southwest only the amount received on its W-2 tax form (App. 512). Tennky in turn issued no 1099 tax form in the name of Robert Gray (App. 513).

"Q. Nothing at all went to the Government to indicate Robert Gray received $9,750.00, did it?

"A. That is correct." (R. 513.)

Gray testified that he filed an amended return on September 2, 1969, and paid the tax due on the $9,750.00, but he could not recall whether the Examining Agent had discussed that with him prior to his filing the amended return. He testified further on cross-examination:

"Q. You are saying you do not recall today whether Agent Farrar had discussed these omitted checks with you prior to filing that amended return?

"A. No, sir, I don't.

"Q. You said you did hear Agent Caldwell say you admitted that to him?

"A. That is correct. I don't remember admitting it to him. I remember him testifying about it.

"Q. Your interview with him was January 8, 1970, wasn't it?

"A. Somewhere in there." (R. 516.)

It was after the foregoing part of the cross-examination of Gray that counsel for the government received permission to approach the bench.

"(Whereupon there was a discussion at the bench between the Court and counsel out of the hearing of the jury).

"MR. GREER [Government Counsel]: Your Honor, I intend to introduce evidence and cross examine the defendant on additional items of income which he received and did not report on his tax returns for the years 1967 and 1968. These are both relevant and admissible inasmuch as it is very much a part of this trial. These are similar acts and they are the identical crime for which the defendant is on trial here today.

"THE COURT: Mr. Nelson objects, I suppose, because they are not alleged in the indictments. Since they are similar crimes the ruling is they are admissible to show intent." (R. 523.)

Mr. Nelson, counsel for Gray, did indeed most strenuously object but the court adhered to its ruling with the caveat:

"I will have to charge the jury this is admissible only to show criminal intent. In other words, if they are not to convict him on this as a separate crime mentioned in the indictment, but they are allowed to consider it." (R. 525.)

The court did adequately so instruct the jury. Nonetheless, the ensuing vigorous cross-examination was, in all probability, extremely prejudicial to the defendant Gray. The result of the trial really turned on criminal intent vel non.

### Restriction on Number of Character Witnesses

At the beginning of the trial the government submitted to the court a brief containing the following paragraph:

"The Government anticipates that the defendant will offer the testimony of character witnesses in his behalf. Courts in the past have been faced with the problem of where to draw the line on limiting the number of character witnesses. A limitation of character witnesses to three (3) has most frequently been found appropriate and has been approved by the Courts of Appeal. See United States v. Squella-Avendano [478] F.2d [433] (C.A.5th, April 13, 1973); United States v. Jacobs, 451 F.2d 530 (C.A.5th, 1971), certiorari denied, 405 U.S. 955 [92 S.Ct. 1170, 31 L.Ed.2d 231]. The limitation of character witnesses is, of course, in the Court's discretion."

After Gray's third character witness had testified, a colloquy between Gray's counsel and the court occurred.

"MR. NELSON: If it please the Court, we have several other character witnesses—

"THE COURT: It has been the unvarying rule of this Court long before my time and upheld by the Fifth Circuit Court of Appeals that character witnesses are limited to three. We apply that rule here.

"MR. NELSON: For the record, because the character and reputation is of such importance in the type of crime charged here, we respectfully object to the Court's ruling." (R. 403.)

On appeal, Gray insists that the district court applied no discretion but arbitrarily used a fixed and unvarying rule. Since the leading case on "character evidence," Michelson v. United States, 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, it has been well settled that trial courts are vested "with discretion to limit the number of such witnesses and control cross-examination." 335 U.S. at 480, 69 S.Ct. at 220. See also 6 Wigmore on Evidence, 3d ed. § 1908(2), pp. 580, 581; 2 Wright Federal Practice & Procedure, Criminal § 409. However, this Court has not upheld any "unvarying rule" and we agree with the annotation in 17 A.L.R.3d 327, at 335, that,

> "The number of witnesses allowed to testify should not be arbitrary or unreasonably restrictive, and prejudicial error in those respects will entitle the injured party to relief. A general rule of limitation applicable to all cases without regard to the particular circumstances has been held to exclude discretion and to be, therefore, unreasonable and unlawful." (Footnotes omitted.)

Professor Wigmore calls attention that the limitation of the number of witnesses applies not only to reputation or character but may be enforced *"upon any point whatever"* (emphasis in text). 6 Wigmore on Evidence, 3d ed. § 1908(3), p. 581. Especially pertinent to this case are Professor Wigmore's further remarks:

> "It is sometimes required that the trial Court (with or without the parties' motion) *announce before any witnesses on the point are offered*, that a limitation of the witnesses upon the particular fact will be enforced, and a failure to do this is said to prevent the enforcement of any limitation; on the theory that, unless the party is thus advised of the intended limit, he may be obliged to omit his most valuable witnesses through not having known of the necessity of choosing the best of the lot at his disposal. This requirement has a plausible fairness in it, and is usually proper when feasible. But

it is not always feasible, because the judge may not know of the party's intention as to number of witnesses; and it is not always proper for the judge to commit himself to such a fixed limit before hearing any of the witnesses. The trial Court's discretion should be left to determine whether such a prior notice was feasible and desirable under the circumstances." (Emphasis in text.) (Footnote omitted.)

At pp. 585, 586. We think it clear that the district judge meant no more than to recognize such a long-standing practice which should "apply here"; that in fact he exercised a sound and reasonable discretion in this particular case.

*Permitting a Revenue Agent to Testify as a Summary Witness and Introducing a Summary Chart or Schedule of his Calculations*

In his opening statement to the jury, counsel for the government called attention to the necessity of introducing many documents and corporate records, and further said:

> "The law recognizes in this case no juror can be expected to retain all this information and put it in the proper slot. For that reason, the government is entitled to bring in an expert to testify in the case. The law permits the expert to listen to the testimony, examine the documents and testify to his expert opinion as to what these documents mean and what tax, if any, should have been paid by the defendant.
>
> "You, as jurors, are entitled to give that expert's opinion the weight you believe it deserves. What I am saying is for you to bear with us because a tax case is like a jigsaw puzzle and at the end we will put it all together." (R. 7–8.)

In accord with that announced strategy, the government called as its last witness a revenue agent for the purpose of summarizing the evidence and making the resulting tax computations. Similarly, the defendant called as his last wit-

ness a certified public accountant who testified at length as to his qualifications and as to a schedule summarizing the evidence.

The propriety of that practice in income tax cases was clearly established by the Supreme Court in United States v. Johnson, 1943, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546. Since *Johnson*, the practice has been accepted and followed in cases too numerous to mention, some of which are listed in the margin.[1] The opinions in many of those cases quote from the opinion in *Johnson, supra*, written by Mr. Justice Frankfurter:

" * * * The worth of our jury system is constantly and properly extolled, but an argument such as that which we are rejecting tacitly assumes that juries are too stupid to see the drift of evidence. The jury in this case could not possibly have been misled into the notion that they must accept the calculations of the government expert any more than that they were bound by the calculations made by the defense's expert based on the defendants' assumptions of the case. So long as proper guidance by a trial court leaves the jury free to exercise its untrammeled judgment upon the worth and weight of testimony, and nothing is done to impair its freedom to bring in its verdict and not someone else's we ought not be too finicky or fearful in allowing some discretion to trial judges in the conduct of a trial and in the appropriate submission of evidence within the general framework of familiar exclusionary rules."
319 U.S. at 519–520, 63 S.Ct. at 1241.

■ On the trial, defendant avoided making a frontal attack upon a practice so well settled. Instead, his first insistence was that a summary witness was not needed in a case no more complicated than this, that "there is an extreme in our case," and "a real danger of a person who purports to be an expert invading the province of the jury." (R. 291.) The district court disagreed, recounted the many exhibits and expressed its view that "the jury could not possibly understand or correlate them without the assistance of an expert." (R. 291.) The judge stated further that the evidence would be admitted, " * * * we think in the proper exercise of our discretion and in order to assist the jury, but with a cautionary instruction, conclusions reached by the expert as to whether or not there was a deliberate, willful understatement of income is the function of the jury rather than the expert." (R. 291.) Defendant's counsel then stated: "[W]e would like to point out the defendant is not by and large disputing the fact that he earned the income asserted by the government. It is a matter of intent and willfulness almost solely. The cases indicate there is a little danger that the jury in hearing an expert testify will conclude by the expert saying there is tax due that there is guilt." (R. 291, 292.)

After further colloquy, the jury was excused from the courtroom pending a voir dire examination of the witness, Malcolm L. Johnson. He had 17½ years' experience as a revenue agent with the Internal Revenue Service, and had testified in two other criminal tax evasion cases. He was not a graduate accountant, had little experience in oil and gas

1. Cave v. United States, 8 Cir. 1947, 159 F.2d 464, 468; United States v. Daisart Sportswear, 2 Cir. 1948, 169 F.2d 856, 863; Kirsch v. United States, 8 Cir. 1949, 174 F.2d 595, 601; Graves v. United States, 10 Cir. 1951, 191 F.2d 579, 584; Gross v. United States, 9 Cir. 1953, 201 F.2d 780, 787; Wardlaw v. United States, 5 Cir. 1953, 203 F.2d 884, 885; Banks v. United States, 8 Cir. 1953, 204 F.2d 666, 670; Beaty v. United States, 4 Cir. 1954, 213 F.2d 712, 720; White v. United States, 5 Cir. 1954, 216 F.2d 1, 5; Steele v. United States, 5 Cir. 1955, 222 F.2d 628, 629–630; Smith v. United States, 6 Cir. 1956, 239 F.2d 168; Blackwell v. United States, 8 Cir. 1957, 244 F.2d 423, 431; United States v. Kiamie, 2 Cir. 1958, 258 F.2d 924, 933; Barber v. United States, 6 Cir. 1959, 271 F.2d 265; United States v. Willis, 3 Cir. 1963, 322 F.2d 548, 551; Wirtz v. Turner, 7 Cir. 1964, 330 F.2d 11, 14; Barsky v. United States, 9 Cir. 1964, 339 F.2d 180; United States v. Mackey, 7 Cir. 1965, 345 F.2d 499, 507.

law, and was not familiar with a "carried" working interest in an oil well, nor with three Fifth Circuit cases dealing with the income tax effects of a "carried" interest, *viz.*, C. I. R. v. J. S. Abercrombie Co., 1947, 162 F.2d 338; Prater v. C. I. R., 1959, 273 F.2d 124; United States v. Cocke (en banc), 1968, 399 F.2d 433. The court was recessed overnight to permit Mr. Johnson to read those three opinions and also for the Judge to study and analyze those cases.

The importance of those cases to Gray's defense was claimed because of the terms of his employment by Southwest. Under a letter agreement dated August 15, 1967, Gray was employed by Southwest Production Company. The agreement provides:

> "My beginning salary shall be $1500 per month, payable on the 1st and 15th days of each month. In addition I shall receive 5% of the economic interest retained by Southwest Production Corporation and the related companies in all oil and gas properties acquired after August 15, 1967, plus 5% of the economic interest retained by those companies in any leases presently owned on which leases wells are drilled in the future. Economic interest is defined to include working interest, overriding royalty, oil payment, production payment, etc.

> "After November 15, 1967, either party wishing to terminate this agreement may do so on 90 days written notice." .

(Gov't Exh. 22.) In practice, Southwest and Gray were in accord that Gray's "economic interest" was free and clear of any liability for intangible drilling expenses. As to current operating expenses of a producing well, Southwest contended that Gray should pay a proportionate share, while Gray claimed that he did not owe any such costs. No drilling costs or operating costs were actually paid by Gray.

After the overnight recess for consideration of the three cases (*Abercrombie, Prater* and *Cocke*), the district judge stated to counsel his analysis of those cases and his conclusion that they were inapplicable to the case on trial, except for their possible bearing on the question of Gray's good faith in taking deductions for intangible drilling costs and for depreciation upon the equipment necessary for production. We agree.[2]

■ The district court did not err in overruling the defendant's objection to the competency of Johnson as an expert summary witness. Nor did the court err in allowing Johnson's testimony to be introduced with the court's caveat to the jury: in effect, that Johnson's opinions were not binding upon the jury but were meant to be helpful and were entitled to such weight as the jury might see fit to accord them; that the jury was bound by the judge's instructions as to the law, while the questions of criminal intent, willfulness, good faith and other questions of fact were left for the jury to determine. We find no reversible error in the district court's rulings on the testimony of the government's expert summary witness.

### Cross-examination of Defendant

■ On trial, as has been stated, Gray's main defense was that he acted in good faith and had no criminal intent. In refuting that defense, the government could properly cross-examine Gray as to similar acts of attempted income tax evasion committed during the calendar years of 1967 and 1968, in addition to the acts charged in the indictments. United States v. Jernigan, 5 Cir. 1969, 411 F.2d 471; United States v. Waller, 5 Cir. 1972, 468 F.2d 327; accord Ahrens v. United States, 5 Cir. 1959, 265 F.2d 514; Wright Federal Practice & Procedure, Criminal § 410.

---

2. On appeal, counsel does not seriously argue that Gray was entitled to the deduction of $8,700.00 shown on his 1967 Tax Returns as "intangible drilling and dry hole expenses." Gray's good faith vel non in claiming that deduction was left to the jury.

We find no reversible error committed in the cross-examination of the defendant. His cross-examination was thorough and vigorous but nonetheless fair.

*The Court's Instructions to the Jury*

■ The court properly refused defendant's requested jury instruction No. 10, which concluded:

"Under court decisions by the United States Court of Appeals for the Fifth Circuit, which includes Louisiana, a carried party could, between the years 1947 and 1968, deduct his proportionate share of the cost of development and operation of the well even though he did not spend any of his own funds to pay for these costs. Commissioner of Internal Revenue v. [J. S.] Abercrombie Co., 162 F.2d 338 (5th Cir., 1947); Prater v. Commissioner of Internal Revenue, 273 F.2d 124 (5th Cir., 1959); United States v. Cocke, 399 F.2d 433 (5th Cir., 1968)."

As has been developed, the cited cases had no relevance to Gray's tax liability. They might possibly bear upon the question of whether he acted in good faith and without criminal intent.

The court refused also defendant's requested jury instruction No. 7 concerning willfulness and particularly charging:

"There must be specific wrongful intent to conceal an obligation known to exist as compared to a genuine misunderstanding of what the law required."

■ The court's general charge included an instruction to the same effect (R. 740). The court fully and properly instructed the jury that Gray could not be convicted because of mistake, inadvertence or other innocent reason, but that willfulness and specific criminal intent must be proved.

Finding no reversible error, the judgment is ·

Affirmed.