## HUSTEN v. UNITED STATES.
### No. 10900.

Circuit Court of Appeals, Eighth Circuit.
Feb. 24, 1938.

WOODROUGH, Circuit Judge, dissenting.

———◆———

Thomas W. McMeekin, of St. Paul, Minn. (McMeekin & Quinn, of St. Paul, Minn., George F. Callaghan and Myer H. Gladstone, both of Chicago, Ill., on the brief), for appellant.

Victor E. Anderson, U. S. Atty., of St. Paul, Minn. (George A. Heisey, Asst. U. S. Atty., of St. Paul, Minn., on the brief), for appellee.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

An indictment returned in the District Court of the United States for the District of Minnesota charged that appellant, on the 9th day of September, 1936, "knowingly and unlawfully did transport in interstate commerce, to-wit: from the City of Freeport, or the vicinity thereof, in the state of Illinois, to the city of Minneapolis in the county of Hennepin in the state and district of Minnesota, and within the jurisdiction of this court, certain stolen goods, to-wit: jewelry, consisting of rings of the value of $5,000 or more, which jewelry theretofore on the date aforesaid shortly prior to the commencement of the unlawful interstate transportation aforesaid, at a point near said city of Freeport, Illinois, had been stolen from one John Kraus, President of the House of Kraus, ring manufacturers, Pittsburgh, Pennsylvania, defendant at the time and during the course of said unlawful interstate transportation then and there well knowing the goods aforesaid to have been so stolen."

This indictment was based upon the provisions of the National Stolen Property Act, §§ 1–7, 48 Stat. 794, 18 U.S.C.A. § 413 et seq. Section 415, 18 U.S.C.A., provides:

"Whoever shall transport or cause to be transported in interstate or foreign commerce any goods, wares, or merchandise, securities, or money, of the value of $5,000 or more theretofore stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken, shall be punished by a fine of not more than $10,000 or by imprisonment for not more than ten years, or both."

It is shown without dispute that, September 9, 1936, John Kraus, partner in, and salesman for, a manufacturing house of jewelry located at Pittsburgh, Pa., was robbed of approximately 500 articles of jewelry, to wit, rings with diamond, cameo, and other settings. This jewelry was carried by Kraus principally as samples in calling upon the retail trade in the line of his business. The robbery took place near Freeport in the state of Illinois, and the robbers left with the jewelry at 1:30 in the afternoon of the above date. The distance from Freeport, Ill., to Minneapolis, Minn., is approximately 325 miles. At 10:52 p. m. of the same day appellant registered at the Radisson Hotel in Minneapolis,

Minn., under the name and address of "G. L. Brooks, Duluth," and was assigned to room 1010 of that hotel. He had but one piece of baggage, a bag of medium size. At about 11 o'clock p. m. the room-service department of the hotel received a telephone call from room 1010 for one sandwich and one malted milk. Five minutes later came a second call to repeat the order. This double order was served about 11:30 p. m. on the usual service table. The waiter found appellant and another man in the room. No outgoing telephone calls were registered from the room that night.

At 1:30 a. m., September 10, 1936, a group of men composed of three special agents of the Federal Bureau of Investigation Field Service for the District of Minnesota, two Minneapolis police detectives, and the Radisson Hotel house detective, together visited appellant's room. This group was headed by the Special Agent in charge. The house detective rapped and requested admission. The rap was repeated and then appellant asked who was there. The house detective replied and demanded admittance. Appellant then asked for the manager of the hotel, and was told that the manager was present. At least two and one-half or three minutes elapsed before the door was opened, and during this interval officers testify that they heard a "thud" within the room which sounded "like two things coming together, like the dropping of the screen or the pulling down of a window." An examination made of the window and screen disclosed marks of recent disturbance, and the hands of the examining officer were covered with a dark dust similar to that appearing upon the hands of appellant, who claimed that this had resulted from his removal of the service table from his room to the hall. However, no dirt appeared upon this table nor upon the cloth with which it was covered. There was no dirt upon the bed clothes nor upon appellant's pajamas, although he said he had been reading in bed after the removal of the table. Contemporaneously, one of the officers found the stolen jewelry in the alley beneath the window of room 1010. It was contained in two packages, one of which had burst open, apparently in the fall; and the rings therefrom were scattered over the alley within a radius of 8 or 10 feet. The jewelry was positively identified as that stolen from Kraus September 9, 1936, near Freeport, Ill. It

must necessarily have reached Minneapolis by interstate transportation. A search of the room resulted in finding a Ford ignition key, which appellant told the officers fitted a car belonging to a gambler friend in Chicago, where appellant said he' also lived. Appellant also told the officers that on the night of September 9th he had arrived from Chicago on the Burlington Zephyr, and came directly to the hotel. The Zephyr, however, did not arrive in Minneapolis until 10:59 p. m. He also said that a woman, not a man, as seen by the waiter, had been in his room that night, but he declined to reveal her name. He said he had come "to visit his folks in St. Paul," and had assumed the name of Brooks because he feared his divorced wife might locate him and cause him embarrassment. He thought she was somewhere in the Twin Cities. Special Agent Stein asked him "why, if his folks lived in St. Paul, why did he register in a Minneapolis hotel." He said: "I have nothing to say about that." "I asked him whether he came to Minneapolis with someone on the night of September 9, 1936; he stated he came alone." The appellant did not testify in his own behalf, and the trial resulted in conviction.

Two points are urged by appellant in this appeal: (1) There was no evidence to prove that the defendant transported the jewelry in interstate commerce or that he knew that it had been stolen. (2) The value of the property alleged to have been stolen and transported in interstate commerce was less than $5,000, within the intent and meaning of the National Stolen Property Act.

■■ 1. That the property was stolen near Freeport in the state of Illinois stands without dispute, and that it was found in Minneapolis, Minn., establishes that it was transported across interstate borders. The theft was completed and the jewelry left the scene of the robbery at 1:30 p. m., September 9, 1936. Appellant registered at the Radisson Hotel in Minneapolis at 10:52 p. m. of the same day. Nine hours and twenty-two minutes had elapsed. The distance between Freeport and Minneapolis is 325 miles—a distance easily traversed by automobile within that time. We deem it unnecessary to make further analysis of the testimony adduced to establish appellant's possession in Minneapolis. It speaks for itself. The rule limiting the application of presumptions in criminal cases cannot be invoked to destroy the force of legitimate and obvious inferences.

■■ As said by this court: "It is well established that the unexplained possession of stolen property shortly after the theft is sufficient to justify the conclusion by a jury of knowledge by the possessor that the property was stolen." Niederluecke v. United States, 8 Cir., 47 F.2d 888, 889; Bruce v. United States, 8 Cir., 73 F.2d 972. In the latter case this court cited Drew v. United States, 2 Cir., 27 F.2d 715, 716, in which it was said:

"The plaintiff in error argues that there was no evidence of transportation by him. It appears that the plaintiff in error was in possession of the stolen property in New York within 12 days after it had been stolen in New Jersey. This raised a presumption that he was the thief and had transported it to New York."

It is true that such presumptions are subject to explanations, but we find in this record nothing to disturb the conclusion reached by the jury on this point. The court correctly declared the law, and no exception was taken to its charge except upon the question of the value of the property stolen, essential to federal jurisdiction. See, also, Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Degnan v. United States, 2 Cir., 271 F. 291, and Rosen v. United States, 2 Cir., 271 F. 651.

2. The scope and purpose of the act under which this prosecution is brought is revealed by its title: "An Act To extend the provisions of the National Motor Vehicle Theft Act to other stolen property." 48 Stat. 794. The ease and rapidity with which stolen motor cars, from their inherent nature, might be conveyed across state boundaries, thereby greatly obstructing the processes of law enforcement, led to the adoption of the National Motor Vehicle Theft Act, 18 U.S.C.A. § 408. The increasing employment of the same facilities to convey other stolen property speedily to distant markets led to the extension of the original act to cover stolen property of any description. Of course, in order that federal jurisdiction may attach, interstate transportation must be present; and the value of $5,000 was fixed to confine that jurisdiction to larcenies of a substantial nature.

■ The contention of appellant that the value of the stolen jewelry is less than

the jurisdictional amount is based largely upon the rule prevailing in civil cases where damages are sought for breaches of contract or similar defaults, and the objective is compensation for loss sustained. This depends largely upon the nature of the commodity and the relationship existing between the parties involved. Illinois Central R. R. Co. v. Crail, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699, 67 A.L.R. 1423, is a case involving this civil rule. But the National Stolen Property Act has no relationship whatsoever to the loss of the party from whom the goods are stolen. The prosecution is in no sense for the purpose of directly or indirectly reimbursing the loser. It is for the punishment of an offense that has become so common and so serious that this action of Congress was demanded. This construction is "in harmony with the context and supports the policy and purposes of the enactment." Donnelley v. United States, 276 U.S. 505, 48 S.Ct. 400, 401, 72 L.Ed. 676; Ash Sheep Company v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L. Ed. 522; Wilson v. United States, 8 Cir., 77 F.2d 236.

 It is uniformly held that the value of the stolen property is the market value at the time and place of taking if it has a market value. People v. Gilbert, 163 Mich. 511, 128 N.W. 756, Ann.Cas.1912A, 894; Robinson v. State, 107 Neb. 591, 186 N.W. 977; Cunningham v. State, 90 Tex. Cr.R. 500, 236 S.W. 89; 17 Ruling Case Law 66, § 71; 36 Corpus Juris 883. The trial court charged that, in the present case, that would be the retail market value. These rings were of the same character and quality as those sold to jewelers upon them as samples. Mr. Kraus dealt with the retail trade, which bought his rings for the purpose of sale at retail. They had an individual retail market value, and the entire lot were susceptible of valuation as such. In such case the retail value should prevail over the wholesale or replacement value, and there is here presented no situation which would warrant consideration of the value at wholesale or for replacement. Mr. Kraus placed the retail value conservatively at $7,500. The witness Rotzler, a Freeport jeweler, testified that the rings had a retail market value at Freeport, Ill., at substantially the time and place of taking, and placed that value at $8,890.25. He says:

"I based my opinion as to the total value of these rings, from examining each one separately, and figuring what it would cost us and then what profit we would add to it; I arrived at the figures that I just gave you; I resorted to my previous experience in connection with this same line of goods at Freeport."

Mr. Gravender, employed in the retail jewelry business in Minneapolis, testified that rings of that quality had a general retail market in his city, where the stolen property was found, and arrived at the same valuation as Mr. Rotzler. For the defense, two St. Paul jewelers placed the retail value at between $4,000 and $5,000. Our conclusion is that the trial court correctly charged as to the proper basis of valuation, and that the jurors had before them evidence substantially supporting the verdict rendered. The judgment accordingly is affirmed.

WOODROUGH, Circuit Judge (dissenting).

The statute made the jurisdiction in this case dependent on the value of the salesman's sample stock of jewelry stolen and transported in interstate commerce. In bulk, as the merchandise was when stolen and transported, its value amounted to less than the required $5,000, but the trial court instructed that the standard or criterion of value was the "retail market value," which was more than $5,000. I think that standard gave a fictitious value and erroneously expanded the jurisdiction. It will become more obvious when the standard is applied to value sacks of coffee or cases of cigarettes or hogsheads of beer or bundles of pelts or casks of rum or any of a thousand things which like jewelry fetch a great price in broken bulk and costly setting over the retail counter. In Illinois Central R. R. Co. v. Crail, 281 U. S. 57, 50 S.Ct. 180, 74 L.Ed. 699, 67 A. L.R. 1423, the court had to find the value of some coal lost out of a car load in transit and settled upon the wholesale value. The opinion together with the four opinions in the same case within this Circuit, Crail v. Illinois Central R. R. Co., 8 Cir., 2 F.2d 287; Crail v. Illinois Central R. R. Co., 8 Cir., 13 F.2d 459; Crail v. Illinois Central R. R. Co., D.C., 21 F.2d 836 and Illinois Central R. R. Co. v. Crail, 8 Cir., 31 F.2d 111, exhaust the subject. I see no merit in the contention that that long litigation only settled the standard in civil

cases for the jury to measure the value of goods, wares, and merchandise which are in bulk at the time they are to be valued. In such civil cases the true value measures the damages. Here it delimits the jurisdiction, but the standard or criterion of valuation ought to be the same. The matter is of far reaching importance and I therefore dissent.