**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John Robert PERRY,**
**Defendant-Appellant.**

**No. 80–1116.**

United States Court of Appeals,
Fifth Circuit.
Unit A

March 5, 1981.

Victor K. Sizemore, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., San Antonio, Tex., LeRoy Morgan Jahn, Michael S. McDonald, Asst. U. S. Attys., El Paso, Tex., for plaintiff-appellee.

Before GOLDBERG, GARZA and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant Perry was convicted of transporting in interstate commerce stolen goods of a value in excess of $5,000, knowing same to have been stolen. 18 U.S.C. § 2314. On his appeal, the defendant principally contends that the district court erred in not granting his motion for a judgment of acquittal grounded on the government's failure to prove that the stolen property transported by him had a market value of $5,000 or more, a statutory prerequisite for conviction of the federal crime. The transported goods had been stolen from a manufacturer-wholesaler. We find that the "market value" of goods stolen from a wholesaler is the *wholesaler's* sales price, and thus we reject the government's contention that the "market value" should be fixed at the price that would have been charged by a *retailer* who had first purchased the goods at the wholesaler's price. The defendant's motion for a judgment of acquittal at the close of the government's evidence should therefore have been granted by the district court. Under the rule followed in this circuit, however, when a defendant puts on evidence after his motion for judgment of acquittal has been denied, the sufficiency of the evidence to support his conviction is to be determined by a reviewing court on the basis of the record as a whole. Nevertheless, since we find no evidence in the record which can properly be used to supply the deficiency in the proof of market value, we reverse the conviction.

In its case in chief, the government contented itself with producing proof of the market value of stolen cashews and pistachios transported by Perry on a trip ending with his arrest on November 1, 1979. As we shall note more fully in Part II, below, the government's proof at most shows a total *wholesale* value of the cashews and pistachios of between $3,309.12 and $4,715.88, and a total *retail* value of between $6,540.48 and $8,446.56.

Thus, if the latter (retail) price is the appropriate measure of the market value of transported goods stolen from a wholesaler (the theory of the government's case) in the trip ending November 1, the defendant's motion for acquittal at the close of the government's case was properly denied by the district court. However, for reasons set out in Part I below, the market value of goods stolen from a wholesaler is instead the wholesale price of these goods. The issue then presented is whether the defendant's admissions under cross-examination that he had transported goods on *previous* occasions, when he took the stand following the erroneous denial of his motion for a judgment of acquittal, may supply the deficiency in the "jurisdictional" $5,000 value not previously proved by the government.

The opinion will below discuss: I. The market value of stolen goods for purposes of the offense charged; II. A summary of market value evidence presented by the government in its case in chief; and III. Whether, for the purpose of determining on review the sufficiency of the evidence that the aggregate market value of the transported goods exceeds the statutory minimum of $5,000, the appellate court may consider—under the present indictment—testimony by the defendant as to the value of stolen goods transported on occasions other than that proved by the government, at least where that testimony was presented by the defendant following the district court's erroneous denial of his motion for judgment of acquittal.

I

*The Offense*

The defendant is convicted of a violation of 18 U.S.C. § 2314, insofar as it provides: "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud...." The parties agree that, as charged by the district court, the three essential elements that must be proved beyond a reasonable doubt in order to estab-

lish this offense are: *First*: That the Defendant transported or caused to be transported, in interstate commerce, items of stolen property as described in the indictment; *Second*: That such items had a value of $5,000; and *Third*: That the Defendant acted knowingly and willfully.

■ As summarized in *United States v. Nall*, 437 F.2d 1177, 1187 (5th Cir. 1971) (italics in the original opinion):

> While we agree that the $5,000.00 limitation was not designed to protect those who transport stolen property of a lesser value, its effect is to leave the punishment of such persons to the several states and to make the limitation an essential part of the federal crime. Proof of the value of the property at the time it was stolen or at some time during its receipt, transportation or concealment is essential to conviction of the crime against the United States. The test of the sufficiency of such proof on motion for judgment of acquittal is whether, taking the view most favorable to the Government, a reasonably minded jury might accept the relevant evidence as adequate to support a conclusion of a defendant's guilt *beyond a reasonable doubt.*

The statutory test for determining value for purposes of the offense charged by 18 U.S.C. § 2314 (transporting goods "of the value of $5,000 or more, knowing the same to have been stolen"), is furnished by the definition of 18 U.S.C. § 2311:

> "Value" means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof.

In the present case, since no "face" or "par" value of the stolen goods is established, the issue is what was their "market value" if stolen in wholesale lots from a wholesaler—was it the price at which the wholesaler would have sold them, or was it instead the retail value of the goods if sold to consumers by retailers purchasing them from the wholesaler?

*"Market Value"*

■ The general test for determining the market value of stolen property is the price a willing buyer would pay a willing seller either at the time and the place the property was stolen or at any time during the receipt or concealment of the property. *United States v. Reid*, 586 F.2d 393, 394 (5th Cir. 1978), *cert. denied*, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979), *citing United States v. McClain*, 545 F.2d 988, 1004 (5th Cir. 1977); *United States v. Tobin*, 576 F.2d 687, 693 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1979); *United States v. Nall*, 437 F.2d 1177, 1186 (5th Cir. 1971); *Herman v. United States*, 289 F.2d 362, 366 (5th Cir.), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961). As these decisions indicate, the value of the stolen property is a jury question, but the $5,000 "jurisdictional" minimum is an essential element of the federal offense. *See United States v. Chandler*, 586 F.2d 593, 602 (5th Cir. 1978), *cert. denied sub nom. Morrow v. United States*, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979).

Applying these general principles, it seems apparent that the market value of goods stolen in wholesale lots from a wholesaler would be the price at which the wholesaler would sell them. With regard to the cashews involved here, for instance, a buyer would be willing to buy a case of cashew nuts (containing 144 small packages) at its wholesale price of $17.28, but he would not likely be willing to purchase a case containing 144 small packages of cashews at the cumulative sum of the retail price[1] of 25 cents per package that each consumer purchasing a single package would pay—*i. e.*, a total of $36 for the case instead of its wholesale price of $17.28.

The district court, however, instructed the jury on the issue as follows: "The word

---

1. "Retail price" is here used in its dictionary sense: See Webster's New Collegiate Dictionary, verbo "retail:" (verb) "to sell in small quantities directly to the ultimate consumer; (adj.) "of, relating to, or engaged in the sale of commodities at Retail" (1975).

'value' means the face, par, or market value, or cost price, *either wholesale or retail,* whichever is greater." This, or course, might be an accurate statement of the test, if the goods had been stolen from a retailer for sale to consumers after the goods had been purchased by the retailer from the wholesaler. The government argues, however, that the same test applies as well when the goods are stolen in wholesale lots from a wholesaler.

In so arguing, the government relies on our decision in *Herman v. United States,* 289 F.2d 362 (5th Cir.) *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961), which indeed contains language susceptible to that interpretation.[2] Such an interpretation of the *Herman* ruling is further reinforced by its citation of the then-extant decisions of the Sixth and Eighth Circuits that held to such effect, and by its quotation in a footnote of the rule enunciated by one of these decisions: *Gordon v. United States,* 164 F.2d 855, 858–59 (6th Cir. 1947), *cert. denied* 333 U.S. 862, 68 S.Ct. 741, 92 L.Ed. 1141 (1948) and *Husten v. United States,* 95 F.2d 168, 171 (8th Cir. 1938). *Accord, United States v. Stoner,* 487 F.2d 651 (6th Cir. 1973); *Cave v. United States,* 390 F.2d 58 (8th Cir.), *cert. denied,* 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968) (the victims here, however, were retailers); *United States v. Willis,* 322 F.2d 548 (3d Cir. 1963).

Subsequently, at least one other circuit has declined to follow the *Husten-Gordon* rule. *United States v. Tippett,* 353 F.2d 335 (4th Cir. 1965), *cert. denied,* 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 664 (1966), contains an excellent articulation of the dichotomy between wholesale and retail market value. Somewhat distinguishing *Herman* and disapproving of the reasoning in *Gordon* and *Husten,* the Third Circuit concluded that the term "market value" should be given "its normal meaning in a commercial trans-

action where, as here, the goods which were stolen were held for sale by the lawful owner [a wholesaler] in the ordinary course of business," and that "the wholesale value" would be "the going price for [stolen property of] this make and quality and therefore the market value at the time and place of the theft." 353 F.2d at 338. The *Tippett* court felt that to give this normal meaning to the term market value as applied to products stolen from a wholesaler was more compatible with the congressional intent and "neither grasps for federal jurisdiction nor misconstrues Congress' intent in placing a jurisdictional meaning on the federal offense." *Id. See also United States v. Berkwitt,* 619 F.2d 649 (7th Cir. 1980); *United States v. Baldivid,* 465 F.2d 1277 (4th Cir.), *cert. denied,* 409 U.S. 1047, 93 S.Ct. 519, 34 L.Ed.2d 499 (1972).

We have concluded that the Fourth Circuit's reasoning in *Tippett* is more consistent with the congressional intent and the general principles applicable to market value, *i. e.,* what a willing buyer would pay a willing seller. In the case of goods stolen in wholesale lots, this would be the wholesaler's price, not the cumulative price of each item if sold by a retailer to various consumers.

We have further concluded that, in light of the facts and the precise issue before our court in *Herman v. United States, supra,* its actual holding is consistent with that view. There, a jewelry case containing 900 rings was stolen from a manufacturer-wholesaler of jewelry. The precise issue was whether this lot of rings was worth only $4,800 (the cost of production)—*i. e.,* below the "jurisdictional" value; or whether instead their value was the victim's cost of production plus the *wholesaler's* mark-up—*i. e.,* the sales price at which the wholesaler offered the goods for sale to retailers.[3] It is in the

---

2. See citations of *Herman* to such effect, such as: Annot., Stolen Property—Value—Proof, 15 A.L.R. Fed. 336, 342–43 (1973); *United States v. Berkwitt, infra,* 619 F.2d 649 at 657 (7th Cir.); *Cave v. United States, infra,* 390 F.2d at 67 (8th Cir.).

3. The abbreviated description of the facts in the appellate report in *Herman* is most reasonably so interpreted. However, to be certain we were not in error, we sent for the briefs filed in this court on the appeal, our docket no. 18012, and we likewise sent for the original record from the United States District Court for the Southern District of Florida, their docket no

light of that issue that *Herman* stated that the "[g]eneral *retail* value" including "a reasonable mark-up" would furnish evidence of the market value of a stolen product; *Herman* had, however, previously defined market value as "the price a willing buyer would pay a willing seller at the time and place the property was stolen." 289 F.2d at 366.[4] As so used, the "retail value" referred to the price at which the manufacturer-wholesaler would "retail" (*i. e.*, sell) the rings in small lots to *its* ultimate customers, *i. e.*, themselves retailers of jewelry (*see* note 3 *supra*).

*Herman* thus held nothing more than that the market value of property stolen from a manufacturer-wholesaler was the *wholesale price* for the sale of the goods, rather than the *cost* to the manufacturer-victim of their production. It further held that the aggregate market value of goods stolen from a wholesaler was to be fixed at the unit value multiplied by the number of units stolen, rather than finding a value based upon all units (in that case, 900 rings) being offered in globo at one sale. 289 F.2d at 367.

The issue before the court in *Herman* thus did not involve any use of the retail price to the ultimate consumer as fixing the "market value" of goods stolen from a wholesaler, which in fact he intended to market at *his* wholesale price; the decision's holding did not relate to the mark-up retail jewelers might add to the wholesale price in order to pay *their* retail overhead and to make *their* retail profit. *Herman* defined market value in terms of what a willing buyer would pay a willing seller "at the time and place the property was stolen"; it seems to us that to value the stolen rings at the retailer's price, rather than the wholesale price at which the wholesaler-victim of the theft valued the property, would be inconsistent with *Herman's* central reasoning.

■ We therefore conclude that, for the purposes of 18 U.S.C. §§ 2311, 2314, the market value of goods stolen in wholesale lots from a wholesaler should be valued at the actual market value (*i. e.*, the wholesale price) at which that victim offered the

11,063 ·M ·Criminal. Examination of the briefs indicates that the defendant's experts had testified that the manufacturer's cost was between $4,408.94 and $4,800.00, while the manufacturer-victim testified it was $5,897.80, to which would be added an increment for "a gross profit, which covers all the expense of office telephone, rent, traveling expense, hotels, and so forth", for a total fair market value of $7,500. The record corroborates that this $7,500 "fair market value" was the selling price of the stolen rings by the victim from whom stolen, a manufacturer-wholesaler. Tr. 265. This victim testified that he sold the rings to "customers", whom he stated were "retail jewelers", "manufacturing jewelers", "special order jewelers", and "wholesalers". Tr. p. 153. He stated that his fair market value of $7,500 included his profit and overhead expense. Tr. p. 265. There is no testimony whatsoever in the record as to any value of the stolen goods calculated at the price they would be sold by the victim's customers (primarily retailers) to any ultimate consumers.

4. The full quotation is as follows, 289 F.2d at 366 67:

The standard test for determining market value of stolen property is the price a willing buyer would pay a willing seller at the time and place the property was stolen. "[M]ere cost of production, cost of replacement, value

to the owner, value to one who might have use of it under certain circumstances, whatever else it might be, is not market value. For that value—market—depends on a market, whether formal or informal, in which willing buyers bargain with willing sellers." *Abbott v. United States*, 5 Cir., 1956, 239 F.2d 310, 313. The government's experts computed the value of the goods as cost of production plus mark-up, while the defense witnesses computed their value as cost of production alone. General retail value would naturally include a reasonable mark-up, and evidence as to retail value of the goods is properly admissible. *Gordon v. United States*, 6 Cir., 1947, 164 F.2d 855; *Husten v. United States*, 8 Cir., 1938, 95 F.2d 168.

We read the language "aggregate value of all goods" as contemplating the sum of the values of the individual articles, and not the lump sum value of all the articles as a single whole. The government experts, therefore, properly computed the unit value (cost of production plus mark-up) and multiplied by 900 rather than estimating the market value for 900 rings in one sale. Substantial evidence shows that the jewelry case and jewelry contained in it were worth more than $5,000.

goods for sale rather than a fictitious retail price that might have been fixed by a retailer who had purchased the goods (at the wholesale price) for resale to an ultimate consumer at sufficient profit as suited the hypothetical retailer's purposes.

## II

The indictment charged that "on or about October 31, 1979" the defendant Perry knowingly transported stolen goods of a value in excess of $5,000 from California to Texas. In the government's case in chief it contented itself with attempting to prove the retail value of stolen cashews and pistachios allegedly in Perry's truck during the trip. As we will summarize, the wholesale price of these stolen cashews and pistachios was in fact less than $5,000.

The defendant Perry was a truck driver for Pet, Inc. on a regular run from Georgia to California and return. For the return run from California, the truck would there be loaded with products of Laura Scudder, the snack food division of Pet. The substance of the government's case is that the defendant Perry paid an employee at Laura Scudder's California plant to load his truck with Laura Scudder products in addition to those for the authorized shipment per bill of lading for delivery in Texas, and that he would sell the thus-stolen Laura Scudder products to Newsom, an El Paso, Texas warehouseman (who then sold the products to the El Paso flea markets at a greatly discounted price).

The defendant was arrested on November 1, 1979, while he was in the process of unloading Laura Scudder products at Newsom's warehouse in El Paso. After the arrest, all Laura Scudder products in the warehouse were reloaded onto the truck and, subsequently, inventoried. The factual difficulties in this case arise, not only because of difficulties in the evidence as to the price of the products, but also because of the uncertainty as to how much of the reloaded goods had been delivered to the warehouse by the defendant Perry on the date in question (rather than, say, previously by the three other Pet truck drivers and perhaps others who from time to time had similarly delivered California-stolen Laura Scudder products to Newsom's Texas warehouse).

As to the quantity of stolen goods in the truck, the evidence reveals that, at the time of Perry's arrest, there were still 120 cases of cashews on the truck. As to the number of cases of pistachios and cashews unloaded by Perry and his two confederates prior to the arrest, only one government witness was able to make any estimate. An FBI witness conducting the surveillance estimated that, in the twenty-five minutes of unloading prior to the arrest, from 200 to 250 cases (of unknown content) had been unloaded. Tr. 131. (Perry himself stated at the time of his arrest and at the trial that he had unloaded 72 cases of pistachios and 22 cases of cashews.)

Viewing the evidence most favorably to the government and affording its case all favorable inferences that may reasonably be drawn, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we do not believe that a reasonably minded jury could conclude that more than 200–250[5] cartons had been unloaded from the truck and placed in the warehouse. The government's evidence shows that the three participants had unloaded cases for not more than twenty-five minutes prior to their arrest. The government's evidence also shows that, after the arrest, it took twelve persons between one to one and one-half hours to reload the Laura Scudder products (*see* note

---

5. Actually, the FBI witness admitted that the 200–250 figure was merely an estimate, and this candid and honest witness had earlier admitted the limitations of his observation after darkness at 7:00 p. m. of the poorly lighted warehouse area at a distance of 100–125 yards. It if were material to our resolution of the issues presented, we would be forced to consider that the lower figure was much more likely to be accurate, in view of the relatively short period of 25 minutes spent by three men unloading products, compared with the 1 to 1½ hour period required by twelve men to reload 460 cases of cashew and pistachio products (and also some 400 other cases of other varieties of Laura Scudder products, not shown to have been involved in any theft or transport by the defendant).

5 *supra*) found in the warehouse onto the truck.

The jury could thus reasonably find that no more than 320–370 cartons (120 still on the truck, 200–250 unloaded into the warehouse prior to the arrest) of stolen nut-products were transported by Perry from California to Texas on the November 1 trip.

With regard to the wholesale value of these stolen cashews and pistachios, we will not repeat here our detailed computations. It is sufficient to say that, on the basis of quantity of the wholesale prices to which a government witness testified, the wholesale value of these stolen products was between $3,309.12 (320 cases) and $4,715.88 (370 cases).

In addition, if we accept an inventory introduced for another purpose as valid evidence of prices and quantities,[6] there were additional cashews and pistachios of a value of $1,645.76 in the warehouse at the time of Perry's arrival at the scene. There were also other Laura Scudder products (only presumed to be stolen—by *someone*—because Laura Scudder did not ship to the El Paso retail market) of a wholesale value of $4,666.30. (As to these latter, the evidence does not reflect that Perry had access to the Laura Scudder facilities that processed them.) Even assuming the evidence and inferences most favorably to the government, we cannot assume that Perry had transported all or part of these Laura Scudder products in the warehouse, if indeed they were stolen. For one reason, the evidence indicates that at least three other truck drivers on Perry's run had from time to time themselves misdelivered Laura Scudder products to the warehouse, with a fair inference that the warehouseman purchased from other sources as well.

In *United States v. Chandler*, 586 F.2d 593 (5th Cir. 1978), this court faced a similar issue, in the face of equally indefinite proof, as to whether the quantity of stolen gas transported exceeded $5,000 in value. In reversing the convictions for violation of 18 U.S.C. § 2314, the court—"[w]ithout reaching the confusing and conflicting computational battle fought by the parties"—found that the government's proof of the stolen goods transported was too "speculative" and "was founded on the tenuous assumption" that each load carried the maximum value (capacity). 586 F.2d at 602. The court concluded, *id.*,

> This very speculative assumption, necessary to bring the government's most favorable computations within the jurisdictional minimum, is too tenuous to support the convictions on Count Two. Although we are quite sure that the $5,000 limitation was not designed to protect those who transport property of a lesser value but rather to avoid overtaxing the federal judicial system, its effect is to leave the punishment of such persons to the states and to make the limitation an essential part of the federal crime.

For similar reasons, we are unable to find that the evidence can reasonably be found to support any jury finding that the requisite "jurisdictional" amount here was proved on the basis of the Laura Scudder products already in the warehouse when Perry arrived on November 1, if even indeed they can be presumed to have been stolen.

---

6. Relying upon its theory that it need prove only *retail* value, the government educed on direct examination of its value-witness only that he had taken an inventory of the Laura Scudder products on the truck (as reloaded from the warehouse) and that the retail value of the cashew and pistachio products thereon was $10,649.77. On cross-examination, the witness testified as to the wholesale value per case of the cashews and pistachios. The defendant's counsel cross-examined this witness on the basis of the inventory he had taken (not previously introduced into evidence), in order to show the indefiniteness and inaccuracy of the retail price figures; the defendant's counsel then introduced this inventory into evidence as Defendant's Exhibit A, in connection with his cross-examination of the witness. Arguably, he did so for the limited purpose of showing the insufficient basis for the retail price to which the government witness had testified. Since it is not material to our disposition, we will pretermit discussion of this issue and assume, for present purposes, that his unrestricted introduction of the exhibit into evidence permitted the jury to consider all its contents, including prices and quantities to which the government witness did not specifically testify.

## III

■ The defendant's motion for acquittal at the close of the government's case was, therefore, incorrectly denied. (The motion for acquittal was renewed at the close of all the evidence and was again denied.) As the defendant argued, the government's evidence did not prove that the stolen goods transported had the "jurisdictional" value of $5,000 essential to conviction of the federal crime charged. Nevertheless, in this circuit, a defendant cannot on appeal complain of the erroneous denial of his motion for acquittal filed at the close of the government's case if the deficiency in the evidence is cured by the evidence presented in his own behalf following such erroneous denial. *United States v. Cashio*, 420 F.2d 1132, 1134 (5th Cir. 1970). This rule, although it has been rejected by two circuits and has been subjected to scholarly criticism, is also followed by six other circuits. 8A Moore's Federal Practice ¶ 29.05 (1980).

After the government rested, the defendant Perry testified in his own behalf. The substance of his defense was that the diversion of Laura Scudder products by its truck drivers was a common practice and that the company implicitly authorized such diversion (for gifts to truck-weighers, etc.). He admitted to having two or three dealings in the three months previous to the November 1 trip with Newsom, the warehouseman, and to having told the FBI agent at the time of his arrest that he had *received from $1,500 to $2,500 cash* (in addition to a little-valued 1965 Mustang) for these previous (unauthorized) deliveries of Laura Scudder products to Newsom in the prior three months. Tr. 213.

If these admissions can be considered in reviewing the sufficiency of the evidence showing the $5,000 statutory minimum, they are adequate to support a finding that, in addition to the $3,309.12 wholesale value of stolen nuts proved to have been transported on the November 1 trip, the defendant Perry had within the previous three months transported stolen goods for more than the some $1,700 deficit in the government's proof of "jurisdictional" value. The stolen goods sold to the warehouseman for $1,500 to $2,500 (plus an old automobile) could reasonably be found to have had a wholesale value of three or four times that amount; Perry admitted that on the November 1 trip he intended to sell to the warehouseman for $1,000 certain nut products (144 cases of cashews, 72 cases of pistachios), which the evidence reveals to have had a wholesale value of at least $3,821.04.

In summary, whether or not the goods previously stolen and transported (on dates unshown) within the previous three months were still in the warehouse, Perry's admissions are sufficient, when added to the government's case, to establish the $5,000 statutory minimum. The question now is whether such aggregation is permissible.

■ The value of stolen goods transported in discrete shipments in interstate commerce may be aggregated in order to meet the statutory minimum of $5,000 only when the goods are "referred to in a single indictment," 18 U.S.C. § 2311, and the shipments "have enough relationship so that they may properly be charged as a single offense." *Schaffer v. United States*, 362 U.S. 511, 517, 80 S.Ct. 945, 949,. 4 L.Ed.2d 921 (1960). Thus, regardless of the admissibility *vel non* of Perry's admissions as proof of his guilt of the crimes actually charged in the indictment, unless the indictment does, in fact, charge him with transporting the *previously*-stolen goods, their value cannot be considered, for the purposes of aggregation, in determining the existence of the $5,000 statutory minimum.

■ The grand jury indictment in this case states in full:

That on or about October 31, 1979, Defendant, JOHN ROBERT PERRY did transport in interstate commerce from the State of California to the State of Texas, in the Western District of Texas, stolen goods, wares and merchandise of a value in excess of $5,000, knowing the same to have been stolen, in violation of Title 18, United States Code Section 2314.

This "bare-bones" indictment thus charged the defendant in terms of the stat-

ute with all of the essential elements of the crime. We cannot, therefore, doubt its sufficiency to charge Perry with the criminal act that did, in fact, occur on or about October 31, and that the government did, in fact, attempt to prove at trial. *See, e. g., United States v. Farabee,* 411 F.2d 1210, 1211 (5th Cir. 1969); 1 Wright & Miller, *Federal Practice and Procedure* § 125, at 236–37, § 126, at 268 n.86 (1969). As will be shown, however, it is not sufficient to charge him with the *prior* criminal acts that he admitted, so that the value of the stolen merchandise transported on previous occasions can be considered as "referred to in [this] single indictment" for purposes of computing the "aggregate value" charged by the indictment, as provided by 18 U.S.C. § 2311. To hold otherwise would be to trivialize the jurisdictional amount requirement embodied in § 2314.

Fairly read, the language of the indictment charges Perry only with the transportation of stolen goods "on or about October 31." Nothing in the indictment states or suggests that anything other than a single criminal act is contemplated. No reference to any prior shipments or to any other goods is made or implied. The indictment does not describe a series of shipments or an ongoing criminal enterprise encompassing a series of shipments. There is, in short, nothing to put Perry on notice that the offense with which he was charged could include conduct other than that of the specified date.

To be sure, allegations of date in an indictment are seldom viewed as essential elements of the crime charged, and errors in such allegations are largely ignored. *See, e. g., Russell v. United States,* 429 F.2d 237, 238 (5th Cir. 1970). As Professor Wright has noted:

[G]reat generality in the allegation of date will suffice, though the defendant may be entitled to a bill of particulars if the allegation is too general to permit him to prepare his defense. The allegation [of date] is not regarded as going to an essential element of the crime, and, within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.

1 Wright & Miller, *supra,* § 125 at 246–47. But the present indictment suffers neither generality nor error in its allegation of date. Had the indictment been less precise in dating the offense—had it alleged, for example, that the offense occurred "on or about the fall of 1979," *see United States v. Wells,* 180 F.Supp. 707, 708 (D.Del.1959)—or had it contained some additional statement of facts and circumstances, it might be fairly read as referring to prior shipments and other goods. But as it stands, its very precision precludes such a reading. Professor Wright has noted, *supra,* that errors in the allegation of date can be ignored, and "proof of any date before the return of the indictment and within the statute of limitations is sufficient." But this does not mean that an indictment correctly charging a defendant with violating a particular statute on a specified date can be read as charging that defendant with all violations of the statute that have occurred within the applicable statute of limitations. Indeed, the absurdity of such a proposition is patent.

As the Supreme Court has noted:

In a number of cases the Court has emphasized two of the protections which an indictment is intended to guarantee, reflected by two of the criteria by which the sufficiency of an indictment is to be measured. These criteria are, first, whether the indictment "contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet,' " and, secondly, " 'in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.' ..."

*Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) (all citations omitted). In keeping with these requirements, the Court noted that [a]n indictment not framed to apprise the defendant "with reasonable certainty of

the nature of the accusation against him ... is defective, although it may follow the language of the statute." ... "Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." ... [T]hese basic principles of fundamental fairness retain their full vitality under modern concepts of pleading, and specifically under Rule 7(c) of the Federal Rules of Criminal Procedure....

*Id.*, 369 U.S. at 765–66, 82 S.Ct. at 1047–48 (citations omitted). Absent some reasonable indication on the face of the indictment of its intent to encompass conduct occurring within a wider time-frame than that embracing the single shipment, or conduct occurring under the aegis of some broader,

more systematic course of activity, we cannot conclude that it was framed to apprise defendant Perry with reasonable certainty that he was being charged with the transportation of any goods other than those transported during the October 31-November 1 shipment.

We therefore conclude that the indictment in the instant case did not charge defendant Perry with the prior shipments of stolen goods that formed the subject of his admissions in the court below so as to "refer to" the goods transported in those shipments for aggregation purposes within the meaning of 18 U.S.C. § 2311.[7] For this reason, the value of those goods cannot be aggregated with the value of the goods transported in the shipment that culminated in Perry's arrest on November 1, in order to establish the $5,000 jurisdictional amount required by § 2314.

7. In reaching this conclusion, we hold only that the indictment does not refer to the previously-transported goods, and that their value therefore cannot be considered in determining whether the $5,000 statutory minimum has been met. We do not question the validity or sufficiency of the indictment. We simply note that it does not charge Perry with the prior shipments. Indeed, it seems clear that it did not intend to so charge him.

In its presentation and arguments before the trial jury and in its brief to this court, the government's sole theory of the case was that the value of the stolen goods transported (*only*) on the November 1 trip exceeded the $5,000 jurisdictional value. Only at oral argument on appeal, and then only in response to a suggestion from this panel, did the government for the first time suggest that the jury could have properly considered, in determining whether Perry had transported goods in excess of $5,000, not only the stolen goods transported on the occasion culminating in Perry's arrest on November 1, 1979, but also Laura Scudder products previously stolen and sold to Newsom.

A strong argument could be made that an affirmance on that basis would accept as evidence of guilt of the crime charged evidence relied upon by neither the jury, the government, nor the defendant as going to his guilt or innocence of the offense for which apparently (only) indicted—namely his transportation of stolen goods during the single incident that occurred "on or about October 31, 1979," as charged by the indictment. If under the indictment the government could have sought to prove guilt on the basis of incidents prior there-

to, in fact it did not do so. The record reflects that, commendably, prior to the trial the government afforded the defendant's counsel full access to its investigative file; however, as seems apparent from the testimony of the FBI witnesses, this file concerned information relating primarily to the trip of October 31–November 1, as did the government's original and only complaint filed against the defendant for a violation of 18 U.S.C. § 2314. R. pp. 2–3. In a sense, even if the broadly worded indictment (in the absence of a bill of particulars) afforded theoretical "notice" that the offense with which the defendant was charged could include other conduct than that of October 31–November 1, he did not have *actual* notice that his guilt could be established also by evidence of *prior* violations of the statute, such as that furnished by his own admissions when he freely took the stand to defend himself, as he thought, only against his guilt of the federal offense that involved the October 31 November 1 trip. In this light, we note the dangers pointed out by the Supreme Court in a slightly different context in *Russell v. United States*, cited *supra* in text:

A cryptic form of indictment ... requires the defendant to go to trial with the chief issue undefined. It enables his conviction to rest on one point and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture.

*Russell v. United States*, 369 U.S. at 766, 82 S.Ct. at 1048.

*Conclusion*

Accordingly, since our review of the evidence as a whole in the light most favorable to the government does not show that on the offense for which indicted the defendant Perry transported goods of a value in excess of the $5,000 statutory minimum, we conclude that the district court erred in failing to grant the motion for judgment of acquittal. We therefore REVERSE the conviction.

REVERSED.