**UNITED STATES of America**

v.

**Scott WILLETTE, Defendant.**

**No. 90–CR–53.**

United States District Court,
N.D. New York.

June 3, 1991.

---

Frederick J. Scullin, Jr., U.S. Atty., Wiles & Fahey, Romeo & Romeo, Syracuse, N.Y. (Edward R. Broton, Asst. U.S. Atty., Walter Munson, Robert Romeo, of counsel), for defendant.

MEMORANDUM–DECISION
AND ORDER

McCURN, Chief Judge.

*Background*

On March 7, 1990, a federal grand jury formally indicted Scott Willette ("Willette") with transporting stolen goods across state lines. This indictment charged that from about January 1, 1988, through December 14, 1988, Willette transported, in interstate commerce, knives Willette knew to be stolen from the Camillus Cutlery Company ("Camillus Cutlery or the Company") in

---

New York to the State of Ohio. Specifically, Willette was charged with a violation of Title 18, United States Code, Section 2314, which states, in relevant part:

> Whoever transports, transmits, or transfers in interstate commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years or both.

18 U.S.C. § 2314 (West Supp.1990). The value of the knives purportedly stolen by the defendant was allegedly more than $5,000.00.

At a trial tried to a jury on October 4 and 11, 1990, the government sought to establish Willette's guilt through the testimony of witnesses who allegedly sold knives, known to them to be stolen, to the defendant; as well as by the testimony of several individuals who claimed to have purchased such knives from Willette in Ohio.

In attempting to obtain a conviction in this action, the government offered into evidence various brands and types of knives which the Federal Bureau of Investigation ("FBI") contended implicated the defendant and had itself obtained from a variety of sources; including individuals who claimed to have either received or purchased knives from Willette, as well as from the defendant's own home.[1] In trying to demonstrate a connection between the knives, Camillus Cutlery and Willette, the government also called to the witness stand several employees of the Company, including Mike Dillon, Donald Cook and its president, James Furgal. At the close of the government's proof, Willette, through his attorney, moved for judgment of acquittal pursuant to Fed.R.Crim.Proc. 29, claiming that the government had failed to meet its burden of proving that the value of the stolen knives was $5,000.00 or more. For the reasons stated below, this court granted the defendant's motion.

### Discussion

In order to establish a violation of 18 U.S.C. § 2314, the value of goods known to be stolen and transported in interstate commerce must be $5,000.00 or greater. Section 2311 of this Title defines "value" as the "face, par or market value, whichever is the greatest." Additionally, the aggregate value of all goods referred to in a single indictment constitutes the "value" thereof. *Id.* Because the knives allegedly stolen and transported in this case had no face or par value, proof of their market value was essential for conviction. *See, e.g., United States v. Robinson,* 687 F.2d 359, 360 (11th Cir.1982) (citation omitted).

At trial, the government contended that the correct market value of the stolen knives was their retail market value. They based this assertion on the proposition that value should be, in accordance with the language and spirit of section 2311, the greatest value of the knives to the person who allegedly stole the property—in the present case, the retail value of the knives sold by Camillus Cutlery. The government claimed that *United States v. Berkwitt,* 619 F.2d 649 (7th Cir.1980); *United States v. Stoner,* 487 F.2d 651 (6th Cir.1973) and *Husten v. United States,* 95 F.2d 168 (8th Cir.1938) supported their contention that the legitimate retail market price of the knives allegedly stolen should have been utilized in determining whether Willette had stolen property whose value equalled or exceeded $5000. However, all of these cases were distinguishable from the facts present before the court.

In *Berkwitt,* the court was faced with the arduous task of determining the appro-

---

1. The FBI obtained exhibits 9(a)-(e), which consisted of a Camillus # 11, a NKCA collector's knife, a Sears 100 Anniversary knife, a Remmington R4466 SB and a Remmington R3, by way of a search conducted at the defendant's home, with Willette's consent, on December 16, 1988. The FBI secured exhibits 10(a)-(f) after searching, pursuant to a valid warrant, Willette's home on December 20, 1988. Special Agent William Fleming and Donald Cook, a representative of Camillus Cutlery, purchased some of the knives (exhibits 8 and 8(a)) from Charles Goodall at a knife show held in Alabama. The remaining exhibits were provided to the FBI by Robert Tripp, Jesse Blue and Charles Goodall. These individuals, all of whom testified at Willette's trial, claimed that they bought these knives from the defendant.

priate value of "sound waves" which were illegally recorded onto eight-track cassettes and thereafter sold to the public. *Berkwitt*, 619 F.2d at 657. The property at issue in that case was not the actual eight-track recordings made by the manufacturer, but rather the copies of the manufacturer's recordings made by the accused. That court found that a strong argument could be made for utilizing the legitimate retail market value in determining the stolen property's value, because the bootleg tapes competed with their legitimate counterparts. *Id.* Based upon the unique, intangible property which was stolen, however, the court found the legitimate retail market value misleading in as much as it may have included a profit margin the defendants never could have realized. *Id.* The court thereafter found that a "thieves market" evaluation was a fair representation of the value of the goods, because such market reflected the full price a willing buyer in this market would have paid a willing seller in the same market. *Id.* at 658. Thus, it was the *illegitimate* retail price, not the legitimate retail price, which established the value of the stolen goods.

The action before this court presented a different situation than that addressed by the *Berkwitt* court. The Camillus Cutlery employees who testified at trial, Donald Cook, Mike Dillon and James Furgal, indicated that the knives presented as evidence were defective in that they had factory damage, were unfinished work products, or lacked the requisite etching or serialization.[2] Thus, unlike the goods in the *Berkwitt* case, the merchandise in the present case was either damaged or incomplete; therefore they could not have competed with the legitimate products of Camillus Cutlery.

*Stoner* similarly provided no support for the government's contention. In that case, the defendants were accused of stealing thirty-eight suits from a Memphis, Tennessee merchant. While the appellant-defendants' claims that the government be bound by the wholesale value of the stolen

suits were summarily dismissed, it is clear that the suits were taken from a clothing store which sold its goods at retail, rather than wholesale prices. *Stoner*, 487 F.2d at 653. In the present case, the testimony of the government's witnesses clearly established that the Company operates as a wholesale distributer of the knives it manufactures. The knives of the type allegedly stolen by Willette are not sold by Camillus Cutlery on the retail market, rather they are sold to retailers. Thus, the facts in *Stoner* were clearly inapposite to those in this case.

The *Husten* decision was also factually distinguishable from the case before the court. In *Husten*, a jewelry salesman was robbed of approximately 500 articles of jewelry. These items, while stolen from a wholesale merchant, were nevertheless finished products which were ready for sale in the retail market. *Husten*, 95 F.2d at 171. Additionally, the goods were stolen in the course of dealing with retail trade customers. *Id.* As discussed above, the knives stolen in this case were not ready for sale to the retail outlets for which they were manufactured, nor were these knives products which had any value to a retail merchant. Rather, such knives were damaged, incomplete or otherwise defective. Thus, none of the cases cited by the government supported their contention that the retail market price provided the appropriate value of the knives allegedly stolen by the defendant.

Since the retail market was clearly not the market to be utilized in determining the value of these knives, this court looked to other cases for guidance in ascertaining their value.

In *Robinson, supra,* the eleventh circuit reasoned that the proper market value for courts to utilize in ascertaining the value of stolen property "is the price a willing buyer would pay a willing seller either at the time and the place that the property was stolen or at any time during the receipt or con-

---

2. The unfinished knives did not require both "etching" and "serialization". Rather, depending upon the brand of knife, either etching or serialization would be utilized before such knives were sold to retail stores.

cealment of the property." *Robinson*, 687 F.2d at 360 (citations omitted). The court elaborated on this principle by stating:

> [T]he type of buyer seller transaction used for determining the value of the stolen property is the transaction in which the person from whom the property was stolen would have engaged. If the property is stolen from a retail merchant the market value is the retail sales price. *If the property is stolen from a wholesale merchant the market value is the wholesale price.*

*Id.* (citing *United States v. Perry*, 638 F.2d 862, 865 (5th Cir.1981) (emphasis added)).

In addition to the *Robinson* and *Perry* courts, several other circuits have adopted this test concerning the utilization of the wholesale, rather than retail, market value in determining the value of stolen goods for purposes of 18 U.S.C. § 2314. *See United States v. Cummings*, 798 F.2d 413, 416 (10th Cir.1986); *United States v. Tippett*, 353 F.2d 335, 338 (4th Cir.1965), *cert. denied* 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 664 (1966); *see, e.g., United States v. Schaffer*, 266 F.2d 435, 438 n. 3 (2d Cir.1959) *aff'd*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *United States v. Wigerman*, 549 F.2d 1192, 1193 (8th Cir.1977).

Finding this authority persuasive concerning the issue before it, this court examined the type of sales in which the Company engaged in order to determine the appropriate value of the knives allegedly stolen by Willette.

The testimony of Cook, Dillon and Furgal established that Camillus Cutlery is a wholesale seller of the knives manufactured at the plant.[3] Thus, the only relevant market concerning the knives sold by the Company was the wholesale market. However exhibit # 11, the exhibit relied upon by the government in support of its contention that Willette stole knives whose value was $5000 or more, described the *retail* market value of these knives. This exhibit estimated the total retail market value of the 129 knives allegedly illegally transported in interstate commerce by Willette to be $6,076.45.[4] As stated above, the value to the Company of the knives at issue was the amount they would have received from retail companies, which companies in turn would have sold such knives on the retail market. Thus, the value relevant in the instant action was the *wholesale* market value of the knives. President Furgal's testimony indicated that the retail market prices listed in government's exhibit # 11 included a markup of approximately 30 percent. Thus, the wholesale market value of the stolen knives, using Camillus Cutlery's president's own testimony, was approximately 70 percent of this figure, or $4253.51. This sum was clearly below the $5,000.00 minimum required by 18 U.S.C. § 2314.

For the above stated reasons, the indictment failed for lack of proof and the defendant's motion for judgment of acquittal was granted.

---

3. Furgal and Cook also testified that "seconds", or knives not ready for entry into the retail market because of defects or incompletion, are not sold by Camillus Cutlery to the public.

4. The figures in this exhibit, which listed the name, quantity and retail value of the knives, were based on the prices which Camillus Cutlery recommended its customers utilize as retail prices for the knives.